711 N.E.2d 809 (1999)
305 Ill. App.3d 154
238 Ill.Dec. 422
In the Interest of C.M., R.M., Jr., K.M., and C.M., Minors (The People of the State of Illinois, Petitioner-Appellee, v. Janice Ringer, Respondent-Appellant.)
No. 4-98-0823.
Appellate Court of Illinois, Fourth District.
May 28, 1999.
*810 Mark D. Smith, Assistant Public Defender (Court-appointed), Adams County, Quincy, for Janice Ringer.
Norbert J. Goetten, Director, Robert J. Biderman, Deputy Director, Linda Susan McClain, Staff Attorney, State's Attorneys Appellate Prosecutor, Springfield, for the People.
Justice STEIGMANN delivered the opinion of the court:
In December 1993, the trial court adjudicated C.M. (born in 1985) (hereinafter C.A.M.), R.M., Jr. (born in 1988), K.M. (born in 1991), and C.M. (born in 1993) (hereinafter C.H.M.), the minor children of respondent, Janice Ringer (then Janice Morris), neglected minors (705 ILCS 405/2-3(1)(a) (West Supp.1993)). The court later adjudicated the children wards of the court and appointed the Department of Children and Family Services (DCFS) as their guardian with the power to place them.
In March 1998, the State filed a supplemental petition to terminate respondent's parental rights regarding these children, alleging that respondent (1) was unable to discharge her parental responsibilities (750 ILCS 50/1(D)(p) (West Supp.1997)) and (2) had failed to make reasonable efforts to correct the conditions that were the basis for the children's removal (750 ILCS 50/1(D)(m) (West Supp.1997)). In September 1998, the trial court conducted a bifurcated hearing, in which it first adjudicated respondent an unfit parent on both grounds alleged and later terminated respondent's parental rights.
Respondent appeals, arguing that the trial court's finding of parental unfitness was against the manifest weight of the evidence. We reverse.

*811 I. BACKGROUND
In August 1993, the State filed petitions for adjudication of wardship of respondent's four children, alleging that respondent and her husband at the time, Ronald Morris, neglected their children by failing to provide adequate shelter because they were evicted from their apartment and two different shelters (705 ILCS 405/2-3 (West 1992)). The State also alleged that respondent and Ronald refused to accept the housing opportunities that the State provided them. (Although the trial court terminated Ronald's parental rights in the same proceeding when it terminated respondent's parental rights, Ronald did not participate in that proceeding and has not appealed from the decision. Accordingly, we discuss the evidence relating to Ronald only to the extent necessary to put the State's allegations against respondent in perspective.)
Respondent and Ronald were both hearing impaired, and that fact caused some delay in adjudicating the children's wardship. However, after conducting a hearing on the allegations of neglect in December 1993 and a dispositional hearing in March 1994, the trial court adjudicated the children as wards pursuant to section 2-22 of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-22 (West 1994)), placed them in the custody of DCFS, and granted DCFS the power to place the children in foster care. DCFS subsequently placed the children in the foster home of Kathy and Mike Graham.
In January 1996, the State filed its first petition to terminate respondent's parental rights, alleging that respondent was an unfit parent because she (1) had failed to maintain a reasonable degree of interest, concern, or responsibility as to the children's welfare (750 ILCS 50/1(D)(b) (West 1996)) and (2) had failed to make reasonable progress toward the return of the children within 12 months after adjudication of the children as neglected minors (750 ILCS 50/1(D)(m) (West 1996)). However, in June 1996, the trial court struck the original petition to terminate respondent's parental rights, apparently because the court then learned that the Grahams were interfering with relations between respondent and her children. In August 1996, the court ordered the Grahams to refrain from discussing the children's case with the children.
In March 1998, the State filed a second petition to terminate respondent's parental rights relating to all four children, alleging this time that respondent was an unfit parent because she (1) was unable to discharge her parental responsibilities (750 ILCS 50/1(D)(p) (West Supp.1997)), and (2) had failed to make reasonable efforts to correct the conditions that were the basis for the removal of the children (750 ILCS 50/1(D)(m) (West Supp.1997)). (Although the State in January 1996 had included in its first petition to terminate respondent's parental rights the allegation that she had failed to make reasonable progress toward the return of her children, the State's March 1998 termination petition contained no such allegation, and the record does not reveal the reason for its omission.) In September 1998, the court conducted a bifurcated hearing on the State's petition and granted it. What follows is a summary of the evidence presented during the fitness portion of that hearing.
Michael Spohr testified that he was respondent's DCFS caseworker from August 1994 until August 1996. When Spohr received the case in August 1994, respondent and Ronald were already living in a small apartment that Spohr thought would provide adequate shelter for the children. The only problem was that respondent's sister was living in the apartment with respondent and Ronald. However, respondent and her sister or both agreed that respondent's sister would move out if necessary. Respondent later moved into new housing, which Spohr unconditionally found acceptable, but Spohr did not say when the move occurred.
According to Spohr, respondent attended parenting classes and successfully completed those classes in November or December 1994. Spohr noticed an initial improvement in respondent's parenting skills after she had completed her parenting classes, but he thought her skills later declined.
Tracy Stucker was a caseworker at Hobby Horse Child Welfare Agency (Hobby Horse) and acted as a homemaker, or someone who supervises visitation, for the visits between *812 respondent and her children beginning in June 1995. When Stucker initially received respondent's case, respondent was living in a different community than the Grahams, and the children required transportation to the visits. Stucker often personally provided this transportation, but she could not control the children in the car; they would kick, scream, and otherwise misbehave while being transported to the visit. Eventually, DCFS changed the location of the visits to a church near the children's foster home.
In January 1996, Spohr began allowing respondent to have unsupervised visits with the two oldest children (C.A.M. and R.M., Jr.) in her home. Homemakers would drop by during those visits. Shortly after the unsupervised visits began, the State filed its first petition to terminate respondent's parental rights.
In February 1996, Mary Louise Fuller, an outpatient therapist at the Cass County Mental Health Association who was providing counseling to respondent, C.A.M. and R.M., Jr., sent a letter of resignation to DCFS. Fuller's letter, which was admitted into evidence, stated that Kathy Graham was interfering with the case and with Fuller's effectiveness. When Fuller wrote the letter, she believed Kathy would never cease interfering with the case. DCFS continued the placement of the children in the Grahams' foster care.
Later in the spring of 1996, respondent divorced Ronald. Spohr had told respondent that she would not get her children back as long as Ronald, who was an abusive alcoholic, was in the home and would not follow the service plan. Respondent believed that she could increase the likelihood of securing her children's return by divorcing Ronald.
Spohr testified that in March 1996, one of the homemakers checked in during an unsupervised visit of two children, and they were missing. Respondent thought that they were playing in the yard, but the homemaker and respondent later discovered that the children were approximately two blocks away playing video games in a laundromat. At the time, the children were ages 7 and 9½.
Spohr then decided to restrict respondent to only supervised visits. Stucker continued to attend these visits and opined that respondent was unable to control her children. Stucker also testified that on two occasions, C.H.M. ran into a street, and respondent did not notice. Stucker retrieved C.H.M., whom respondent then scolded. Stucker and respondent agreed to put C.H.M. in timeout as punishment, but respondent allowed C.H.M. out of timeout before the child's time there had expired.
Stucker prepared a visitation report concerning the visits from April 1996 to July 1996. That report, which was admitted into evidence, documented numerous occasions when respondent was unable to control her children. However, the report also documented several occasions when the homemakers were likewise unable to control the children, either before or during the visit, or in the car trip back to the Grahams' house.
Stucker's report also documented several occasions when respondent did properly discipline the children. For example, after the two incidents involving C.H.M.'s running into the street, a visit occurred during which respondent and the children took a walk along a street. Stucker wrote, "[Respondent] did a good job keeping up with the little ones running down the road. She was strict about them walking on the side of the road and not in the middle." Nevertheless, Stucker's report concludes as follows:
"For the most part, visits are usually chaotic due to the inappropriate behaviors of the children. * * *
* * * The poor quality of the visits is due to [respondent's] inability to control the children's behaviors. When workers intervene and attempt to have [respondent] provide appropriate disciplinary measures, she often becomes hostile toward the worker(s) and ignores the redirection stating that `I am the mom!' This results in the children continuing to act out which forces the workers to take on the responsibility of parenting."
During her testimony at the unfitness hearing, Stucker criticized respondent's parenting skill because respondent sometimes brought food to the visitations and cooked *813 her children a meal. According to Stucker, respondent spent too much time preparing the food and not enough time interacting with her children during these visits. When respondent did not cook, one of the workers would drive respondent and the children to a fast-food restaurant.
Stucker also criticized respondent for relying too heavily upon C.A.M. to aid in parenting the other children. Stucker thought that respondent had a peer relationship with C.A.M. rather than a parent-child relationship. On cross-examination, Stucker acknowledged that C.A.M. was the oldest child and the most proficient at sign language. DCFS did not provide sign interpreters during the early visits. When no interpreters were present, Stucker herself relied, in part, upon C.A.M. to communicate with respondent. In response to questions from the court, Stucker stated that respondent attempted to teach the younger children sign language. On a few occasions, respondent used flash cards and spent significant time providing structured lessons. During the rest of the visits, respondent would teach them a little at a time, correcting them as they attempted to sign to her.
Stucker testified that the last visit she supervised was in August 1997. In conclusion, Stucker stated that the visits involving respondent and her children were the worst she observed in her three years' experience at Hobby Horse because of the chaos created by the children's misbehavior.
David Leezer was the DCFS caseworker assigned to the children from August 1996 to April 1998. Leezer's only direct observation of the interaction between respondent and her children occurred on one occasion, when Leezer attended a visit for approximately 15 or 20 minutes. Leezer did not notice any problems during that visit; however, he testified about reports from the homemakers that respondent was inconsistent at disciplining the children and ineffective at controlling them. Leezer recalled one visitation that was terminated early because respondent had acted inappropriately by expressing anger toward the children, but Leezer did not say when that incident occurred.
Scott Moore was respondent's caseworker from August 1996 to August 1997. He attended one visit between respondent and her children in January 1997. He testified that respondent was ineffective at disciplining the children and that she was resistant to the suggestions given to her by DCFS caseworkers.
Moore also criticized respondent for relying upon C.A.M. to interpret her instructions to the other children. Respondent later testified that the hearing impaired commonly rely upon their oldest child to help communicate with the younger children. No contrary evidence was ever presented. However, the DCFS caseworkers believed that during the visits that interpreters attended, respondent should have used those interpreters to communicate with the younger children rather than relying upon C.A.M.
On August 7, 1997, Moore sent a letter to the trial judge, which respondent entered into evidence. In the letter, Moore noted that respondent remarried in July 1997 and that she was maintaining full-time employment and a residence. Moore's letter recommended counseling and continued visitation.
On August 18, 1997, the trial court conducted a permanency hearing and ordered DCFS to set a new permanency goal for the children. On August 21, 1997, the court amended that order by stating that "[a]ny child who indicates a refusal to participate in visitation with [respondent] shall not be forced to so participate." Our review of the record failed to uncover any indication of visitations taking place after that order, although respondent's eagerness to visit is undisputed.
Becky Gengenbacher, a caseworker for DCFS, was assigned respondent's case in December 1997. By then, DCFS had changed the permanency goal to permanent placement with the Grahams. Gengenbacher testified that since December 1997, the children opted not to visit with respondent. In 1998, respondent moved to a different county and told Gengenbacher that the move was prompted by her desire to get a fresh start with a new caseworker. On cross-examination, Gengenbacher admitted that respondent also said that she moved to obtain a bigger *814 house that would better accommodate the children.
In January 1998, respondent wrote a letter to C.A.M., which was admitted into evidence. The letter began by stating, "I love you very much!" However, respondent's discourse quickly degraded, and respondent began blaming C.A.M. for respondent's situation, writing, "I will win the battle too. You are so awful, shame of yourself. I'm planning to [commit suicide] very soon."
After receiving the evidence and hearing arguments of counsel, the trial court found that respondent had not made reasonable efforts to correct the conditions that were the basis for the removal of the children. In so concluding, the court said the following:
"I recall from [the December 1993 hearing in which the children were adjudicated neglected] that one of the big problems was that the children were out of control, that the parents were unable to control their behavior or properly supervise them to the point where landlords and shelters asked them to leave due to damages and complaints from neighbors and the like.
* * *
I find against [respondent] that she is an unfit parent because * * * she has failed to make reasonable efforts to correct the condition which was the basis of the removal of the child[ren] from her. From the beginning, the condition was the ability to properly provide for and supervise the children.
She has been afforded educational opportunities. She's been afforded nearly weekly guidance from visitation supervisors during the visitations. Yet, as pointed out by the visitation workers and the caseworkers, they can see no difference from her ability to supervise and discipline the children as when the case started.
* * *
The * * * problem * * *, I believe, is that [respondent] basically is of an opinion that she tried, she can pick and choose what she wants to do, what she wants to listen to, what advice she wants to accept, and if that's not good enough, it's just too bad. She has rebuffed workers' attempts to help her repeatedly. She cannot control her temper or her emotions in order to achieve her goals. A perfect indication is [p]etitioner's [e]xhibit [No.] 1, the letter to her daughter, blaming the daughter, threatening suicide. It's outrageous. I don't see that there will ever be a change no matter how much time and effort was put into this.
* * * It's a close call on whether she made reasonable efforts[, that] being a subjective standard. She think's she's made reasonable efforts. I don't think that she has."
The trial court also found that respondent was unfit because she was unable to discharge her parental responsibilities. This appeal followed.

II. ANALYSIS
Respondent contends that the trial court erred by finding that (1) she was unable to discharge her parental responsibilities, and (2) she failed to make reasonable efforts to correct the condition that led to the removal of her children. The State concedes that the first basis for the court's adjudication of unfitness was against the manifest weight of the evidence, and we accept the State's concession. Although section 1(D)(p) of the Adoption Act provides that a parent is unfit if she is unable to discharge her parental responsibilities, that section also requires proof "by competent evidence * * * of mental impairment, mental illness[,] or mental retardation." 750 ILCS 50/1(D)(p) (West Supp.1997). The State's evidence was not close to meeting this standard; the trial court specifically found respondent to be intelligent and otherwise capable. Neither party presented any evidence that respondent was mentally impaired, ill, or retarded.
Our review is therefore limited to the trial court's finding that respondent failed to make reasonable efforts to correct the conditions that were the basis of the removal of her children. After careful review of the transcript of the fitness hearing and the documentary evidence presented therein, we *815 conclude that the court's finding was against the manifest weight of the evidence.
The State must prove by clear and convincing evidence at least one statutory ground for unfitness before a trial court can adjudicate a parent unfit. In re A.S.B., 293 Ill.App.3d 836, 843, 228 Ill.Dec. 238, 688 N.E.2d 1215, 1221 (1997). However, reviewing courts give great deference to a trial court's finding of unfitness and will not reverse such a finding unless it is against the manifest weight of the evidence. A.S.B., 293 Ill.App.3d at 843, 688 N.E.2d at 1221; In re A.P., 277 Ill.App.3d 593, 598, 214 Ill.Dec. 299, 660 N.E.2d 1006, 1010 (1996). A trial court's finding is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent. Regan v. Joseph P., 286 Ill.App.3d 889, 892, 222 Ill.Dec. 231, 677 N.E.2d 434, 436 (1997). Further, because each case involving parental unfitness is sui generis, courts do not make factual comparisons to other cases. A.S.B., 293 Ill.App.3d at 843, 228 Ill.Dec. 238, 688 N.E.2d at 1221.
A court can sever a natural parent's rights to her child only through proceedings that strictly comply with the Adoption Act (750 ILCS 50/1 et seq. (West 1996 & Supp. 1997)). A.S.B., 293 Ill.App.3d at 843, 228 Ill.Dec. 238, 688 N.E.2d at 1221; Regan, 286 Ill.App.3d at 891-92, 222 Ill.Dec. 231, 677 N.E.2d at 436; see also In re M.M., 156 Ill.2d 53, 62, 189 Ill.Dec. 1, 619 N.E.2d 702, 708 (1993) (noting that adoption proceedings and proceedings under the Act are creatures of statute, nonexistent at common law). Section 1(D) of the Adoption Act provides a litany of bases for finding a parent unfit (750 ILCS 50/1(D) (West Supp.1997)). Of relevance here is subparagraph (D)(m), which states, in relevant part, as follows:
"D. * * * The grounds of unfitness are any * * * of the following:
* * *
(m) Failure by a parent to make reasonable efforts to correct the conditions that were the basis for the removal of the child from the parent, or to make reasonable progress toward the return of the child to the parent * * *." 750 ILCS 50/1(D)(m) (West Supp.1997).
Subparagraph (D)(m) provides two bases for a finding of unfitness: (1) failure to make reasonable progress toward the return of the child; and (2) failure to make reasonable efforts to correct the conditions that were the basis for removal of the child. Although these two bases coexist within the same subparagraph of the Adoption Act, they are distinct, each requiring separate analysis. See In re J.P., 261 Ill.App.3d 165, 174, 198 Ill.Dec. 565, 633 N.E.2d 27, 34 (1994) (holding that either ground is independently sufficient to support finding of unfitness). Reasonable progress is an objective standard, focusing on the amount of progress toward the goal of reunification one can reasonably expect under the circumstances. However, reasonable effort is a subjective standard, focusing on the amount of effort that is reasonable for the particular parent whose rights are at stake. In re J.G., 298 Ill.App.3d 617, 625, 232 Ill.Dec. 720, 699 N.E.2d 167, 173 (1998), citing In re Allen, 172 Ill.App.3d 950, 956, 123 Ill.Dec. 184, 527 N.E.2d 647, 651-52 (1988).
The two grounds for unfitness found in section 1(D)(m) of the Adoption Act also differ from each other in the goal toward which they require a person to aspire. Reasonable progress relates to progress toward the broadly defined goal of "the return of the child to the [natural] parent." 750 ILCS 50/1(D)(m) (West Supp.1997). In In re L.L.S., 218 Ill.App.3d 444, 463-64, 160 Ill. Dec. 804, 577 N.E.2d 1375, 1388-89 (1991), we took an expansive view of that goal and explained our reasoning as follows:
"If * * * the State * * * challenges the parent's fitness under section 1(D)(m) of the [Adoption] Act on the ground that the parent has failed to make reasonable progress toward the return of the child * * * after the child was adjudicated neglected * * *, the standard by which progress is to be measured is parental compliance with the court's directives, the service plan, or both. The precise circumstances of the parent at the time the court ordered the child removed from the child's parent and *816 before the service plan was in place are not `indispensable' [citation].
* * *
* * * A parent is not divisible into neat compartments; a child who is placed into a parent's custody `gets the whole package,' and a court is duty bound to ensure that serious parental deficiencies of whatever nature have been corrected before the court permits one of its wards to be returned to that parent's custody." (Emphasis omitted.)
In contrast, reasonable efforts relate to the much narrower goal of "correct[ing] the conditions that were the basis for the removal of the child from the parent." 750 ILCS 50/1(D)(m) (West Supp.1997). Parental deficiencies collateral to the conditions that were the basis for the child's removal, even if serious enough to prevent the return of the child, are outside the scope of this inquiry and are therefore not relevant.
In this case, the State alleged respondent was an unfit parent because she had failed to make reasonable efforts to correct the conditions that were the basis for the removal of the children (750 ILCS 50/1(D)(m) (West Supp.1997)). Those conditions, as alleged in the original petitions for adjudication of wardship, were respondent's evictions, resulting homelessness, and inability to provide the children with shelter.
The State at no time attempted to prove that respondent could not provide shelter for the children. On the contrary, the evidence showed that sometime prior to August 1994, respondent secured an apartment, which was small but adequate. At no time during the subsequent 4½ years did respondent live in inadequate housing. In fact, uncontested evidence showed that respondent understood that her children were removed because of inadequate shelter and that she continuously sought better housing, moving several times during the course of this litigation.
Instead of addressing that evidence head on, the State instead attempted to prove that respondent could not control her children because she lacked disciplinary skills. Even if we were to assume that the evidence supported this conclusion (we note that the record contains the suggestion that no one else could control respondent's children either), that evidence is inapposite to the question before the trial court.
The trial court forced the evidence relating to lack of discipline to fit the legal theory before it by finding that the reason respondent had been evicted from her apartment in 1993 was the misbehavior of her children. That conclusion completely lacked evidentiary support in the fitness hearing. In fact, the court stated that this conclusion was based not upon the evidence presented in the fitness hearing, but instead upon the evidence presented during the December 1993 adjudicatory hearing on the State's allegations of neglect. We have previously held that a court's findings in an adjudicatory hearing on a petition to terminate parental rights must be based only upon the evidence presented during that hearing. J.G., 298 Ill.App.3d at 629, 232 Ill.Dec. 720, 699 N.E.2d at 175-76. By relying instead on evidence presented at a different hearing, nearly five years in the past, the court erred.
We note in passing that the error in this case resulted in significant prejudice. Respondent's counsel at the fitness hearing was new and not present during the 1993 hearing adjudicating the children neglected. Thus, not only was respondent's counsel never given a reason to respond to any evidence suggesting that lack of discipline was the reason for respondent's 1993 evictions, he may have been unaware that such evidence even existed.
Trial courts should recognize that any time a child is placed in the custody of DCFS, the potential exists that the reasons for that placementand the underlying conditions bringing it aboutmay someday become relevant in proceedings to terminate the parents' rights. For this very reason, we wrote in L.L.S., 218 Ill.App.3d at 465-66, 160 Ill.Dec. 804, 577 N.E.2d at 1390, as follows:
"[W]hen a child has been formally adjudicated a ward of the court and removed by the court's dispositional order from the custody of the child's parents, the court should direct that steps be taken * * * to achieve a reconciliation and a reunification *817 of the family unit. These directions should include specific steps the respondent * * * must take to correct problems in their lives and specific parental deficiencies which led or contributed to the removal of the child in the first place. If at all possible, the trial court should set forth those steps in a written dispositional order, thereby derailing any later claim that the parents either were not informed or did not understand what they were required to do * * *."
When such an order has been entered, the trial court may take judicial notice of it in later proceedings. J.G., 298 Ill.App.3d at 627, 232 Ill.Dec. 720, 699 N.E.2d at 174. However, when no such order is entered, or an order is entered that lacks the necessary specificity, the underlying reasons for the adjudication of neglect may not later be conjured up via recollection in lieu of competent evidence or judicial notice of some tangible matter of record.
Because the State failed to prove by clear and convincing evidence that respondent failed "to make reasonable efforts to correct the conditions that were the basis for the removal" of her children from her custody (750 ILCS 50/1(D)(m) (West Supp.1997)), we hold that the trial court's decision terminating respondent's parental rights was contrary to the manifest weight of the evidence.

III. CONCLUSION
For the reasons stated, we reverse the trial court's judgment.
Reversed.
KNECHT, P.J., concurs.
McCULLOUGH, J., dissents.
Justice McCULLOUGH, dissenting:
The evidence presented in this case was more than sufficient to terminate respondent's parental rights for failure to make reasonable efforts to correct the condition of inadequate supervision (see J.P., 261 Ill. App.3d at 174-75, 198 Ill.Dec. 565, 633 N.E.2d at 34-35). The majority does correctly point out that was not the condition that was the basis for the child's removal and that respondent was charged with correcting. However, I do not read the "reasonable effort" language in the Adoption Act (750 ILCS 50/1(D)(m) (West Supp.1997)) as limiting the trial court's decision to only conditions included in the original petition to adjudicate the minor neglected or abused.
In construing the language of the Adoption Act, the best interests of the "person to be adopted" are to be given paramount consideration. 750 ILCS 50/20a (West 1996). Although the determination of whether respondent is an unfit parent is determined without consideration of the likelihood of the children being placed for adoption (750 ILCS 50/1(D) (West Supp.1997)), this court's construction of the grounds listed in that subsection should nevertheless give paramount consideration to the children's best interests in accordance with the legislative intent expressed in section 20a of the Adoption Act.
As a ground for parental unfitness, section 1(D)(m) of the Adoption Act designates the "[f]ailure by a parent to make reasonable efforts to correct the conditions that were the basis for the removal of the child from the parent." 750 ILCS 50/1(D)(m) (West Supp. 1997).
"The cardinal rule of statutory construction is to ascertain and give effect to the intent of the legislature. Solich v. George & Anna Portes Cancer Prevention Center of Chicago, Inc., 158 Ill.2d 76, 81 [196 Ill.Dec. 655], 630 N.E.2d 820, 822 (1994); Kraft, Inc. v. Edgar, 138 Ill.2d 178, 189 [149 Ill.Dec. 286], 561 N.E.2d 656, 661 (1990). The words of a statute are given their plain and commonly understood meanings. Forest City Erectors v. Industrial Comm'n, 264 Ill.App.3d 436, 439 [201 Ill.Dec. 537], 636 N.E.2d 969, 972 (1994). Only when the meaning of the enactment is unclear from the statutory language will the court look beyond the language and resort to aids for construction. Solich, 158 Ill.2d at 81 [196 Ill.Dec. 655], 630 N.E.2d at 822." R.L. Polk & Co. v. Ryan, 296 Ill. App.3d 132, 139-40, 230 Ill.Dec. 749, 694 N.E.2d 1027, 1033 (1998).
Moreover, statutes are to be construed to avoid absurd results. People v. Stanciel, 153 Ill.2d 218, 233-34, 180 Ill.Dec. 124, 606 N.E.2d 1201, 1210 (1992). Here, the statutory *818 language does not expressly limit consideration to only conditions that existed at the time of the original petition for wardship. It would be an absurd result indeed if parental rights could not be terminated for a parent's failure to correct a more serious condition that came to the attention of DCFS and the trial court after the child's removal from the parent. It would also be absurd to argue that DCFS and the trial court should be required to release the child to the parents' custody based on the correction of the original condition while a more serious subsequently discovered condition remained uncorrected.
Here, numerous review hearings were conducted and orders entered by the trial court directing the respondent "to cooperate with DCFS and follow the service plan." The order allowing the State's Attorney to withdraw and to name a special prosecutor also placed a protective order against the respondent mother "to not communicate with the children in a way which attaches blame to the children for this case, or otherwise accuse the children of wrongdoing." I disagree with the majority that the trial court is restricted to considering only the conditions alleged in the original petition for adjudication. "Reasonable efforts" can certainly relate to any dispositional order, review hearing order, and permanency review orders. A review of the record reveals many changes of attorneys representing the children and respondent, changes in representation in the State's Attorney's office, and appointment of a special prosecutor. All the while, the same trial judge presided. His findings as to efforts were not and should not be restricted to the allegations of the original petition for neglect. Although the trial court also addressed its ruling to the allegation, inability to discharge parental responsibilities, its findings address the issue of reasonable efforts. In addition to the findings set out in the majority, the trial court found:
"In short, the mother made efforts. Those efforts weren't sufficient. She is unable to do her job as a parent, despite offers of help, assistance, and instruction, and that inability is in large part due to her own refusal to change her way of thinking or her habits. I find that she is an unfit parent."
As to the best interests of the children, the relationship with their mother during the long journey in the court system has suffered severe deterioration. The evidence suggests the children do not desire continued visitation with Mom. A review of the record makes it clear the children have suffered and the trial court's ruling was in their best interest. I believe the trial judge has the responsibility and the prerogative to consider all orders, plans, and directives that are for the benefit of the children and the respondent. The trial court was correct and I would affirm its order terminating parental rights.