730 N.E.2d 637 (2000)
313 Ill. App.3d 1020
246 Ill.Dec. 612
In re D.S., Alleged to be a Neglected Minor (The People of the State of Illinois, Petitioner-Appellee, v. Charlene Sherman, Respondent-Appellant).
No. 4-99-0683.
Appellate Court of Illinois, Fourth District.
June 1, 2000.
*639 Justice STEIGMANN delivered the opinion of the court:
In July 1998, the trial court adjudicated D.S. (born in December 1996), the minor child of respondent, Charlene Sherman, neglected pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 1998)), and placed her in the custody of the Department of Children and Family Services (DCFS). In October 1998, the court adjudicated D.S. a ward of the court and appointed DCFS as her guardian with the power to place her.
In May 1999, the State filed a petition to terminate respondent's parental rights regarding D.S., alleging that respondent was an unfit parent because she (1) failed to make reasonable efforts to correct the conditions that were the basis for the removal of D.S. and (2) failed to make reasonable progress toward D.S.' return to her within nine months of the adjudication of neglect (750 ILCS 50/1(D)(m) (West 1998)). In August 1999, the trial court found respondent unfit on both of the grounds alleged and granted the State's petition.
Respondent appeals, arguing that the trial court's unfitness and best interest findings were against the manifest weight of the evidence. We affirm.

I. BACKGROUND
In its April 1998 petition for adjudication of wardship, the State alleged that D.S. was residing in an environment injurious to her welfare in that her mother and stepfather, Joseph Sherman, had unresolved issues of domestic violence that placed D.S. at risk of harm. On July 30, 1998, respondent admitted the allegations of the petition, and the trial court adjudged D.S. neglected. On October 16, 1998, the court conducted a dispositional hearing, made D.S. its ward, and appointed DCFS as D.S.' guardian. That same day, the court filed its form dispositional order.
In May 1999, the State filed its petition to terminate respondent's parental rights, and in August 1999, the trial court conducted a hearing on the petition. A brief summary of the evidence presented follows.
Respondent and her husband, Sherman, had a history of domestic violence. Respondent had been both a victim and an aggressor, and the couple's altercations required police intervention on several occasions. In April 1998, after one such incident, an order of protection was entered against Sherman. In June 1998, that order was modified, and respondent and Sherman resumed living together. In July 1998, after the incident that resulted in D.S.' removal, Sherman moved out again. In August 1998, Sherman moved back in with respondent.
Gary Romansburger, a child protective investigator for DCFS, testified that pursuant to the original client service plan, *640 respondent was required to (1) complete parenting classes; (2) get domestic violence treatment; and (3) follow the visitation plan. Peggy Mayfield, a team supervisor at Catholic Social Services, testified that in December 1998, respondent was given two additional goals: (1) obtain suitable housing and (2) maintain stable employment.
Respondent completed parenting classes in the summer of 1998 at the Institute for Human Resources in Pontiac.
On October 16, 1998 (coincidentally the date of the dispositional hearing on the State's petition alleging neglect), an apparent domestic violence incident occurred in the parking lot of Catholic Social Services when respondent and Sherman arrived for a visitation with D.S. Respondent and Sherman entered the building separately and in agitated states. Sherman had been scratched and indicated that respondent had done it. Staff members quickly separated them and escorted them out of the lobby. From then on, visitations with respondent and Sherman were scheduled separately.
In November 1998, respondent mother began attending weekly counseling sessions with Cheri Miller, a clinical psychologist at a mental health facility referred to in the record as "BroMenn." Respondent missed several sessions around the holidays, but otherwise attended regularly through March 1999. At the end of March 1999, respondent resumed her relationship with Sherman and stopped attending sessions until July 1999, sometime after the State filed its petition seeking termination of her parental rights. By the time of the August 1999 hearing, respondent had attended four sessions. Miller testified that respondent's progress had been "minimal" for her goals.
Respondent also missed scheduled visitations with D.S. in March and early April 1999. She was late for a visit on April 13 and missed a scheduled visit on April 20. Respondent called to cancel a visit in late April because of her work schedule.
During the fall or winter of 1998, respondent and Sherman separated, and respondent's living arrangements were in flux. At some point, she lived with her mother. In February 1999, respondent lived with her grandmother for a short time. At the end of February, she moved in with her cousin (and her cousin's fiancee and baby) and stayed there until the second week of March. When respondent and Sherman reunited in March, they lived in Bloomington with two other men until sometime in April. They next lived in a motel for a short time. In June 1999, they separated for two weeks, during which respondent lived with Sherman's ex-girlfriend. Brenda Juhnke, a caseworker for Catholic Social Services, testified that none of these arrangements constituted stable residences appropriate for D.S.
Juhnke further testified that on June 16, 1999, she reviewed the client service plan as to respondent's progress since December 22, 1998. With respect to employment, respondent had worked at several locations for several different companies. Juhnke rated respondent's progress on goals of counseling and visitation unsatisfactory since respondent had not been in counseling since March 16, 1999, and visitation occurred sporadically. Juhnke testified that she rated respondent's overall progress on the client service plan in June 1999 as unsatisfactory.
Respondent testified that she intended to stay married to Sherman and that she was pregnant with his child. She and Sherman had not had any incidents of domestic violence since they reunited in March 1999.
Respondent admitted that when she reunited with Sherman in March 1999, she lost her motivation to continue counseling. During the relevant time period, she was registered with temporary employment agencies and worked sporadically. At the time of the hearing, respondent had been working at an establishment referred to only as "Freedom" for about a month. *641 She considered it to be a good job and she intended to keep it. Sherman had not attended domestic violence counseling or treatment of any kind.
The trial court found respondent unfit and immediately heard evidence regarding D.S.' best interests. Sherman's mother, Joy Sherman, testified that D.S. had been living with her and her husband for about one year and that, if respondent's parental rights were terminated, they intended to adopt D.S. D.S. had bonded with the Shermans and was doing well in their care.
Dawn Webber, a child welfare specialist with DCFS, testified that research in domestic violence showed that issues of domestic violence remain unresolved between two people when only one of them participates in treatment.
The trial court terminated respondent's parental rights regarding D.S. This appeal followed.

II. ANALYSIS
Respondent argues that the trial court's finding of unfitness was against the manifest weight of the evidence. We disagree.

A. Findings of Unfitness
Respondent first argues that the trial court's findings of unfitness was against the manifest weight of the evidence.
"[R]eviewing courts give great deference to a trial court's finding of unfitness and will not reverse such a finding unless it is against the manifest weight of the evidence. [Citations.] A trial court's finding is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent. [Citation.] Further, because each case involving parental unfitness is sui generis, courts do not make factual comparisons to other cases." In re C.M., 305 Ill. App.3d 154, 163, 238 Ill.Dec. 422, 711 N.E.2d 809, 815 (1999).

1. Failure To Make Reasonable Progress

Section 1(D)(m) of the Adoption Act provides, in relevant part, as follows:
"The grounds of unfitness are any * * * of the following:
* * *
(m) Failure by a parent * * * to make reasonable progress toward the return of the child to the parent within 9 months after an adjudication of neglected * * * minor * * *." (Emphasis added.) 750 ILCS 50/1(D)(m) (West 1998).
Reasonable progress is an objective standard, focusing on the amount of progress toward the goal of reunification one can reasonably expect under the circumstances. In re J.G., 298 Ill.App.3d 617, 625, 232 Ill.Dec. 720, 699 N.E.2d 167, 173 (1998), quoting In re Allen, 172 Ill. App.3d 950, 956, 123 Ill.Dec. 184, 527 N.E.2d 647, 652 (1988). The standard by which progress should be measured is parental compliance with the court's directives, the DCFS service plan, or both. C.M., 305 Ill.App.3d at 164, 238 Ill.Dec. 422, 711 N.E.2d at 815, quoting In re L.L.S., 218 Ill.App.3d 444, 463-64, 160 Ill. Dec. 804, 577 N.E.2d 1375, 1388-89 (1991).
"`Reasonable progress' * * * exists when the [trial] court * * * can conclude that * * * the court, in the near future, will be able to order the child returned to parental custody. The court will be able to order the child returned to parental custody in the near future because, at that point, the parent will have fully complied with the directives previously given to the parent." (Emphasis in original.) L.L.S., 218 Ill. App.3d at 461, 160 Ill.Dec. 804, 577 N.E.2d at 1387.
In In re D.L., 191 Ill.2d 1, 10, 245 Ill. Dec. 256, 727 N.E.2d 990, 994 (2000), the Supreme Court of Illinois held that, pursuant to section 1(D)(m) of the Act, the only matters that are relevant to a reasonable *642 progress analysis are those that occurred within the applicable period, in this case nine months.

a. Statutory Nine-Month Period Starts on the File Date of the Trial Court's Dispositional Order Completing the Adjudication of Neglected, Abused, or Dependent Minor
Determining the date that starts this time period running is, thus, of critical importance in our evaluation of all pending appeals in termination cases under section 1(D)(m) of the Act and to the parties in cases before the trial courts. We recognize that D.L. used the date that the trial court found D.L. neglected, that is, apparently the date of the adjudicatory hearing, as commencing the relevant time period. D.L., 191 Ill.2d at 4, 13, 245 Ill.Dec. 256, 727 N.E.2d at 992, 996. A judicial opinion is, however, authority only for what is actually decided. Board of Governors of State Colleges & Universities v. Illinois Fair Employment Practices Comm'n, 78 Ill.2d 143, 149, 35 Ill.Dec. 524, 399 N.E.2d 590, 593 (1979). The controversy before the supreme court in D.L. was whether the reasonable progress time period specified in section 1(D)(m) should be construed "as limiting the evidence that may be introduced on that ground to matters occurring within the applicable 12-month span," as argued by the minor's guardian (DCFS) to uphold the appellate court's construction, or as "simply establish[ing] a minimum period of time before a petition alleging that ground may be filed and [not as precluding] the parties from offering evidence of a parent's actions after the expiration of the 12-month period," as argued by the mother and the State. D.L., 191 Ill.2d at 8-9, 245 Ill.Dec. 256, 727 N.E.2d at 993-994. The supreme court agreed with the guardian and the appellate court that section 1(D)(m) "limits the evidence that may be considered under the provision to matters concerning the parent's conduct in the 12 months following the applicable adjudication of neglect, abuse, or dependency." D.L., 191 Ill.2d at 10, 245 Ill.Dec. 256, 727 N.E.2d at 994.
In D.L., respondent mother gave birth to the minor, D.L., on July 8, 1992, and he then tested positive for both cocaine and opiates. DCFS filed its petition for adjudication of wardship on September 15, 1992; on February 9, 1993, the trial court found the minor neglected due to exposure to an injurious environment; and on March 23, 1993, the court adjudicated D.L. a ward of the court and appointed DCFS as his guardian, whereupon DCFS placed the boy in foster care. In re D.L., 298 Ill.App.3d 905, 907, 232 Ill.Dec. 877, 699 N.E.2d 1062, 1064 (1998). On March 16, 1995, the State filed a supplemental petition for termination of the parents' parental rights, alleging five distinct grounds of unfitness. The mother failed to appear at the June 1995 hearing and the court found her in default. She appeared in court on September 27, 1995, however, and the judge vacated the default; she told the judge that she wanted to regain custody of D.L., and the court appointed counsel for her. On November 20, 1995, respondent mother entered a drug treatment program. Between December 1995 and April 1996, the mother cooperated with her supervisors, but they were not ready to return the boy to her. In August 1996, a psychologist conducted a bonding assessment, and the boy did not even recognize her. The court conducted evidentiary hearings on the termination petition in February and June 1997, at the conclusion of which the court found the mother was not unfit, primarily because she had been drug-free for nearly two years. D.L., 191 Ill.2d at 5-6, 245 Ill.Dec. 256, 727 N.E.2d at 991-992.
Unsurprisingly, the appellate court concluded that the record established that the mother was unfit because she (1) failed to maintain a reasonable degree of interest, concern, or responsibility as to the minor's welfare; (2) failed to make reasonable progress toward the return of D.L. within 12 months of the adjudication of neglect; and (3) was addicted to drugs for at least *643 one year preceding the commencement of the unfitness proceeding. 750 ILCS 50/1(D)(b), (D)(m), (D)(k) (West 1994). The appellate court held that the parent's fitness must be based on his or her actions within the first 12 months after the adjudication of neglect, citing section 1(D)(m) of the Act. D.L., 298 Ill.App.3d at 920, 232 Ill.Dec. 877, 699 N.E.2d at 1072. After reviewing the evidence, the appellate court concluded that the trial court erred by focusing instead on the mother's recent improvement, and it reversed and remanded for a best interests hearing. D.L., 298 Ill.App.3d at 922, 925, 232 Ill.Dec. 877, 699 N.E.2d at 1073, 1075. The mother then appealed to the supreme court, which affirmed the appellate court. D.L., 191 Ill.2d 1, 245 Ill.Dec. 256, 727 N.E.2d 990. In D.L., the mother first showed interest in regaining custody in September 1995, 3 years after the minor was placed in foster care, 2 1/2 years after he was adjudicated neglected, and 6 months after the State filed its supplemental petition seeking termination. D.L., 298 Ill.App.3d at 921, 232 Ill.Dec. 877, 699 N.E.2d at 1073. The court there was not called upon to specifically determine whether the statutory 12-month, now 9-month, period commenced running upon (1) the trial court's February 9, 1993, finding that the minor was neglected or (2) the filing of the dispositional order after the court adjudged D.L. a ward of court on March 23, 1993, rendering the adjudication of neglect complete.
We conclude that the issue framed by the parties in D.L. thus failed to focus on the precise question that we must necessarily resolve here: whether the term "adjudication" in the statutory reference to "within 9 months after an adjudication of neglected * * * minor * * *" (emphasis added) (750 ILCS 50/1(D)(m) (West 1998)) refers to (1) the date that the trial court finds the minor neglected, abused, or dependentthat is, the date of the adjudicatory hearing; or (2) the date that the court files its dispositional order on the State's petition for adjudication of neglect, abuse, or dependencythat is, the date on which the trial court completes the adjudication of neglected, abused, or dependent minor. We conclude that it is the latter rather than the former.
At the dispositional hearing, if the trial court declares the child a ward of the court, the court "shall admonish the parents * * * that [they] must cooperate with [DCFS], comply with the terms of the service plans, and correct the conditions which require the child to be in care, or risk termination of their parental rights." 705 ILCS 405/2-22(6)(a) (West 1998).
We recognize that section 2-21(1) of the Juvenile Court Act requires that if, after hearing evidence at the adjudicatory hearing on the State's petition alleging neglect, abuse, or dependency, the court finds that the minor is neglected, abused, or dependent: "the court shall admonish the parents that they must cooperate with [DCFS], comply with the terms of the service plan, and correct the conditions that require the child to be in care, or risk termination of parental rights." 705 ILCS 405/2-21(1) (West 1998). We note that the trial court here failed to give such admonitions at the July 30, 1998, adjudicatory hearing. That fact is not, however, significant to our analysis.
The dispositional hearing on the adjudicatory petition affords the trial court the opportunity to hear further evidence to determine the minor's best interests, consider the permanency goal set for the minor, the nature of the service plan for the minor and services delivered and to be delivered under the plan (705 ILCS 405/2-22(1) (West 1998)); adjourn for a reasonable period (but no more than six months after the initial removal of the child from his or her home) to receive reports or other evidence, set the date for first permanency hearing, admonish the parents (705 ILCS 405/2-22(4) through (6) (West 1998)); and determine where custody will lie, provide for protective supervision or an order of protection, and enter any other orders necessary to fulfill the service plan *644 (705 ILCS 405/2-23(1)(a), (2), (3) (West 1998)). The filing of the dispositional order completes the adjudication, renders it final, and gives rise to the right to appeal the adjudication of neglect, abuse, or dependency.
We note further section 1(D)(m-1) of the Adoption Act, which states, in pertinent part, the following:
"For purposes of this subdivision (m-1), the date of entering foster care is the earlier of: (i) the date of a judicial finding at an adjudicatory hearing that the child is an abused, neglected, or dependent minor; or (ii) 60 days after the date on which the child is removed from his or her parent, guardian, or legal custodian." (Emphasis added.) 750 ILCS 50/1(D)(m-1) (West 1998).
The legislature here demonstrated its ability to distinguish the trial court's finding of neglect at the adjudicatory hearing as distinct from the "adjudication of neglected" (750 ILCS 50/1(D)(m) (West 1998)) when it sees fit to do so.

b. Application
In this case, we conclude that the period ran from the court's October 16, 1998, filing of its dispositional order, when D.S. was adjudged neglected, for nine months that is, to July 16, 1999. At the August 10, 1999, termination hearing, the trial court heard evidence focused on this period.
At the close of the fitness portion of the hearing, the trial court described respondent and Sherman as "unstable, [and] out of control in their relationship." The trial court specifically noted (1) the altercation between respondent and Sherman at the October 1998 visitation; (2) that respondent had abandoned counseling when she reunited with Sherman (and did not resume it until after the State filed the termination petition); and (3) both respondent and Sherman showed unwillingness to complete treatment.
Respondent urges us to conclude that because no incidents of domestic violence had occurred since she and Sherman reunited in March 1999, respondent has adequately addressed the domestic violence issue and has it "under control." Respondent's argument is irrelevant in light of the supreme court's decision in D.L. Respondent had nine months in which to make reasonable progress toward D.S.' return, and those nine months ended on July 16, 1999. Although respondent completed parenting classes and made sincere efforts, through counseling, to turn her life around, three months passed after D.S.' removal before she began treatment, and she was unable to stay the course for more than a few months. Respondent's progress slid backward when she resumed her relationship with Sherman in March 1999. What happened after July 16 is beside the point. Considering the evidence properly before the trial court, the court was fully justified in concluding that respondent would not be able to fully resume parental responsibilities in the "near future." Accordingly, its conclusion was not contrary to the manifest weight of the evidence.

2. Failure To Make Reasonable Efforts

Respondent also contests the court's finding that she failed to make reasonable efforts to correct the conditions that led to the child's removal. 750 ILCS 50/1(D)(m) (West 1998). However, the trial court's determination of parental unfitness need only be supported by proof sufficient to establish one of the statutory grounds. In re J.T.C., 273 Ill.App.3d 193, 198, 209 Ill.Dec. 881, 652 N.E.2d 421, 424 (1995). Given our affirmance of the court's reasonable progress finding, we need not address this additional finding of unfitness.

B. Best Interests Determination
Finally, respondent argues that the record did not contain sufficient evidence to show that terminating her parental rights was in D.S.' best interest. We disagree.
By the time that the trial court conducted the dispositional hearing on the State's petition to terminate respondent's parental *645 rights, D.S. was two years and nine months old and had been in foster care for over one year. Sherman's mother and father were D.S.' foster parents. They had bonded with D.S. and wanted to adopt her.
Joy Sherman testified that D.S. "acted out" at day care after attending visitations with respondent and Sherman. D.S.' behavior improved after Sherman ceased to attend visitations. Joy and her husband had little contact with Sherman, and in the event they adopt D.S., they will not allow Sherman to be a part of her life.
Respondent, on the other hand, testified that she intended to stay with Sherman despite the on-again-off-again nature of their relationship, their history of domestic violence, and Sherman's unwillingness to attend counseling or treatment. Respondent's own treatment was only minimally successful, and the evidence suggests that when respondent is involved with Sherman, she is unable to make D.S. a priority in her life. Thus, the trial court concluded that denying the State's petition would "continue this matter indefinitely * * * with limited chance of success."
We agree with the trial court. It was forced to choose between (1) the possibility of an immediate permanent placement and (2) an indeterminate period of continued wardship. Considering respondent's failure to make reasonable progress toward D.S.' return, the court's conclusion, that termination of respondent's parental rights was in D.S.' best interest, was not against the manifest weight of the evidence.

III. CONCLUSION
For the reasons stated, we affirm the trial court's judgment.
Affirmed.
GARMAN and KNECHT, JJ., concur.