754 N.E.2d 826 (2001)
324 Ill. App.3d 227
257 Ill.Dec. 834
In re A.A. and B.B., Minors (The People of the State of Illinois, Petitioner-Appellee,
v.
Linda A. and Richard A., Respondents-Appellants).
No. 5-99-0116.
Appellate Court of Illinois, Fifth District.
August 10, 2001.
Rehearing Denied September 17, 2001.
*827 Curtis L. Blood, Collinsville, for Appellants.
William Haine, Madison County State's Attorney, Edwardsville; Norbert J. Goetten, Director, Stephen E. Norris, Deputy Directory, Kara L. Jones, Contractual Attorney, Office of the State's Attorneys Appellate Prosecutor, Mt. Vernon, for Appellee.
Presiding Justice CHAPMAN delivered the opinion of the court:
This appeal arises from the termination of the parental rights of Linda A. and Richard A. to their daughters, A.A. and B.B. Linda and Richard argue that the trial court abused its discretion in terminating their parental rights. They also *828 argue that the termination of rights was inappropriate since the State failed to prove the alleged sexual abuse which was the basis for the removal of the children from the home. On June 6, 2000, this court filed this decision as an unpublished order under Supreme Court Rule 23 (166 Ill.2d R. 23). On June 29, 2001, the Illinois Supreme Court entered a supervisory order vacating our Rule 23 order and ordering this court to reconsider our decision in light of the Illinois Supreme Court's decision in In re M.H., No. 89599, 196 Ill.2d 356, 256 Ill.Dec. 297, 751 N.E.2d 1134 (May 24, 2001). Therefore, in addition to the issues raised and resolved in our original disposition, we now consider this case in light of the supreme court's holding in In re M.H. We affirm.

BACKGROUND
On October 30, 1995, juvenile petitions were filed on behalf of minors A.A. and B.B., Linda and Richard's children. The petitions alleged that the minors were abused because of their brother's sexual abuse of A.A. and that they were neglected minors whose environment was injurious to their welfare in that the minors' mother failed to take reasonable steps to protect the minors from sexual abuse.
The court entered an order as to shelter care on October 30, 1995. It found that there was probable cause to believe that the minors were neglected and abused. The court also found that it was a matter of urgency for the protection of the minors that they be placed in shelter care. The court placed the minors in the temporary custody and guardianship of the Department of Children and Family Services (DCFS) and scheduled a hearing on the juvenile petitions.
At the hearing, Richard and Linda admitted the allegations of the petition. The court determined that A.A. and B.B. were abused and neglected, ordered that they remain in the custody of DCFS, and ordered a dispositional hearing.
The dispositional hearing was held on April 30, 1996. The court found that it was in the minors' best interest that they be made wards of the court and placed in the custody of DCFS. The court also ordered Richard and Linda to make sure their son J.A., the brother who allegedly sexually abused A.A., completed sexual abuse counseling. The parents were to provide the results of the counseling to DCFS. The court further ordered Richard and Linda to attend and complete counseling for the prevention of sexual abuse, to complete parenting classes, and to cooperate with DCFS.
A service plan was completed for Richard, Linda, and J.A. on November 27, 1995. The plan required, among other things, the following: J.A. was to obtain a psychological assessment, J.A. was to cooperate with the psychological assessment, J.A. was to cooperate and comply with any and all recommendations of treatment, J.A. was not to reside in the home with the minors, Richard and Linda were to receive a clinical/psychological/psychiatric assessment, Richard and Linda were to attend counseling to learn about sexual abuse and ways to prevent it, Richard and Linda were to participate in counseling to prevent sexual abuse, Richard and Linda were to comply with counseling and attend all scheduled sessions, Richard and Linda were to prevent J.A. from having contact with, providing child care for, or residing in the home with A.A. and B.B., and Richard and Linda were to cooperate with DCFS. Richard and Linda discussed the service plan with a DCFS employee and signed an acknowledgment that the service plan was explained to them and that they received a copy.
A service plan review was held on June 3, 1997. At that time, it was determined *829 that Richard and Linda failed to meet minimum parenting standards. J.A. had failed to meet any of the goals set out for him in the service plan. Richard and Linda had not submitted to a clinical/psychological/psychiatric assessment but had undertaken some counseling. Since the goals of the service plan had not been met, DCFS determined that the minors would remain in foster care, with a goal to return home by December 31, 1997.
On April 7, 1998, a petition to terminate parental rights and for the appointment of a guardian to consent to adoption was filed regarding A.A. and B.B. The petitions alleged that Richard and Linda were unfit persons as described in section 1 of the Adoption Act (750 ILCS 50/1(D) (West 1994)), because: (1) they had failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the minors, (2) they had failed to make reasonable efforts to correct the conditions that were the bases for the removal of the children from them, and (3) they had failed to protect the minors from conditions in their environment that were injurious to their welfare.
At the hearing on the petition to terminate parental rights, the court heard testimony from Gary Crone, a child welfare specialist with DCFS. Crone first became familiar with Richard and Linda in 1979, when there was a report of cuts, welts, and bruises to L.H., Richard's daughter. Crone also testified that there had been a previous indicated report involving an older son of Richard and Linda, M., who reportedly sexually abused B.B. Crone stated that he became involved in the current case when A.A. and B.B. were taken into protective custody after an adjudication of abuse and neglect. The reported incident was that A.A. had been sexually abused by her brother, J.A. A.A. and B.B. were allowed to return home with Richard and Linda after this incident, but Linda was told that she should not allow the minors to be unsupervised with J.A. That night, however, Linda allowed A.A. and B.B. to sleep in the same room with J.A. This incident caused the girls to be adjudicated abused and neglected and taken into DCFS custody.
Service plans in the case had the goal, according to Crone, for Richard and Linda to change their home environment and to learn adequate skills to protect their children. DCFS has received no proof that these goals have been sufficiently met.
Crone testified that when A.A. and B.B. were first taken into protective custody, Linda was told that she should lock J.A. out of the house so he could get the treatment he needed. Linda was told that DCFS would help the family find living arrangements for J.A. and that he would receive assistance from DCFS. Crone stated that Linda told him that she refused to lock J.A. out because she needed his supplemental security income check.
Crone stated that J.A. has been referred to counseling several times but has consistently failed to show up for or to follow up on the treatment for sexual offenders. Crone stated that despite the fact that they were told that the treatment for J.A. was in the best interest of A.A. and B.B., Richard and Linda have not accepted the responsibility for seeing that J.A. follows up on his treatment.
The service plan also called for both Linda and Richard to complete a sexual perpetrator and protection assessment through Alternative Counseling. The first referral was made for Richard and Linda in 1996. However, neither of them submitted to the assessment until 1998. Crone testified that even though treatment was recommended after the assessments, he has not received any proof that Linda or Richard received this treatment.
*830 Richard and Linda did attend some counseling to deal with stress at home. Crone stated that the progress reports he received from the counselors working with Linda and Richard stated that the parents had reached their potential, but the counselor did not believe that the parents could protect their children. The counselor recommended that both parents obtain sexual abuse counseling. Although Crone conveyed the need for Richard and Linda to obtain this counseling, they have failed to obtain it.
Crone stated that Richard and Linda have completed a parenting class. The class, however, did not include specific information about protecting children from sexual abuse. Crone also stated that in the three years after the adjudication of abuse and neglect, he had concerns over some people who lived in Richard and Linda's home. In March 1996, Crone found that Lisa Hardester was living in the home, even though the service plan required her not to live in the home because of her potential to cause danger to the minors. Another man, known to Linda only as Ed, was also living in the home. Crone testified that Ed was suspected of being a child molester. Crone contacted Linda and advised her that Ed needed to move out. Linda told Crone that she had given Ed 30 days to move out.
The visitation plan allowed the family to visit the minors one time a week for one hour. Crone stated that Linda has attended all visitations and interacts fairly well with the minors. Richard's visits were sporadic. J.A. attended one of the visitations. Crone testified that at that visit, J.A. talked to A.A. and tried to tell her that he had not sexually abused her. Crone stated that Linda and Richard did nothing to stop or interrupt J.A., and Crone had to tell J.A. that his behavior was inappropriate and he would have to leave if he persisted.
Finally, Crone testified that both J.A. and M., the son who had previously been locked out for the sexual abuse of B.B., are currently living in Richard and Linda's home.
Jennifer Johnson, a counselor at Alternative Counseling, testified regarding assessments she conducted on J.A., Richard, and Linda. J.A. was referred to Alternative Counseling in 1996, but he attended only two sessions. He was discharged after the second session because he failed to attend sessions, showed elevated hostility, and failed to cooperate with the counseling. It was recommended that J.A. be placed in residential treatment.
In February 1998, J.A. was referred for an assessment of the risk of his committing sexual-offending acts in the future. Johnson stated that J.A. participated in an assessment on September 24, 1997. Prior to his assessment, Linda became very upset. Johnson stated that her testing of J.A. was limited, because Linda intervened and ended the evaluation when Johnson questioned J.A. regarding sexuality issues. Johnson recommended that J.A. receive sex-offender-specific counseling because he had originally admitted to abusing his sister and later recanted, and Johnson stated that he exhibited some indications for sex-offending behavior. Johnson also recommended that J.A. receive drug counseling.
Johnson conducted an assessment with Linda on January 28, 1998. Linda told Johnson during the assessment that she believed that M. was sexually "curious" rather than abusive to B.B. Linda also indicated that she did not believe that J.A. had sexually abused A.A. She stated that she did not know whether she could believe A.A. Johnson further testified that testing on Linda revealed that she was generally misinformed about sexuality and had a tendency to blame the victim for *831 rape or abuse. Johnson recommended further counseling for Linda.
Johnson conducted an assessment with Richard in February 1998. Richard stated that he did not believe that J.A. had sexually abused A.A. but that he did believe that M. had sexually abused J.A. and possibly others. Richard also stated that he believed that DCFS and the sex offender treatment M. underwent had brainwashed M. into stating that he committed sexually offensive acts. Johnson also recommended counseling for Richard.
After the assessments, DCFS referred Richard and Linda to Alternative Counseling for further treatment as recommended by Johnson. They attended one session in June 1998. After that session, they were referred for more counseling but failed to attend three scheduled appointments.
Carol Coulson, a social worker and therapist at Chestnut Health Systems, also testified. She provided counseling to Linda from January 1996 to October 1997. Coulson was working with Linda on her depression and her parenting skills in an effort to help Linda get her children back. Coulson's notes from therapy on October 7, 1996, indicate that Linda was willing to participate in therapy but was unable to deal with abstract ideas like boundaries and protection from sexual abuse. Linda was willing to protect her children from sexual abuse but did not understand how to provide the protection. On April 23, 1997, Coulson again made an assessment of Linda's progress based on her therapy sessions. Coulson believed that Linda cared for her daughters physically and emotionally but did not show an ability to protect them from sexual abuse. Coulson's assessment remained the same at the June 30, 1997, review. Coulson's final assessment was that Linda was still unable to protect the girls from sexual abuse, partly because she did not believe that J.A.'s behavior was a concern or threat to the girls.
Linda also testified on her own behalf. She stated that she understood the service plans that DCFS had made in her case. She also stated that DCFS told her to lock J.A. out of the home after the abuse of A.A. but that she did not do it because Richard refused to allow J.A. to be locked out. She also stated that she was confused about possible changes in the law, so she was afraid to lock J.A. out. She testified that she had tried to help J.A. get therapy but that he rebelled and refused to attend his sessions. She admitted that she interrupted and stopped J.A.'s assessment at Alternative Counseling. She also said that she knew in 1996 that DCFS wanted her to receive an assessment, but she did not get the assessment until 1998.
Linda attended counseling at Chestnut Health Systems for almost two years. She also attended counseling at an agency called Victims First but was informed that the counseling there did not meet DCFS requirements. She then began attending counseling at Alternative Counseling. Linda stated that she always attended visitations with the girls. She testified that at the time of the hearing both M. and J.A. were living in Richard and Linda's home. She stated that she had been trying to get them to move out.
On December 4, 1996, the court entered an order finding that Richard and Linda were unfit for each of the reasons set forth in the petition. On January 12, 1999, a hearing was held to determine whether Richard and Linda's parental rights should be terminated. Gary Crone of DCFS testified that at the time of the hearing both A.A. and B.B. were placed in homes where they were safe and secure and that he believed it was in the best interest of the girls to terminate Richard and Linda's parental rights and to authorize DCFS to *832 consent to the girls' adoption. The court's written order of January 12, 1999, terminated Richard's and Linda's parental rights. It is from that order that Linda and Richard now appeal.

STANDARD OF REVIEW
In cases regarding child custody issues, there is a strong and compelling presumption in favor of the result reached by the trial court. See In re Marriage of Jerome & Martinez, 255 Ill.App.3d 374, 396, 193 Ill.Dec. 74, 625 N.E.2d 1195 (1994). The trial court's determination will not be disturbed unless there is a clear abuse of discretion or the decision was contrary to the manifest weight of the evidence. See In re Marriage of Fuesting, 228 Ill.App.3d 339, 344, 169 Ill.Dec. 456, 591 N.E.2d 960 (1992).

DISCUSSION
The trial court found that Richard and Linda were unfit parents for the reasons set forth in the petition. The three bases for the termination of parental rights listed in the petition were that they failed to maintain a reasonable degree of interest, concern, or responsibility for the welfare of the children, they failed to make reasonable efforts to correct the conditions that were the basis for the removal of the children, and they failed to protect the children from conditions in their environment which were injurious to their welfare.
The first basis for termination was that they failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of A.A. and B.B. Before finding a parent unfit based upon this ground, the trial court is to examine the parent's conduct in the context of the parent's circumstances. See In re Adoption of Syck, 138 Ill.2d 255, 278, 149 Ill.Dec. 710, 562 N.E.2d 174 (1990). These circumstances can include things such as poverty, a lack of transportation, or a need to cope with personal problems, rather than indifference toward the child. See In re T.D., 268 Ill.App.3d 239, 246, 205 Ill.Dec. 708, 643 N.E.2d 1315 (1994); Syck, 138 Ill.2d at 278-79, 149 Ill.Dec. 710, 562 N.E.2d 174.
In this case, the record shows that Linda maintained contact with the children through weekly visitation while they were in the custody of DCFS. However, the trial court found that both Linda and Richard failed to show a reasonable degree of interest, concern, or responsibility for the girls. The record is replete with testimony, some of it from Linda herself, showing that Richard and Linda have not received the recommended therapy to help parents to protect their sexually abused children. Both Linda and Richard waited almost three years to submit to the assessment, recommended by DCFS, to determine parenting skills and their ability to protect the children from sexual abuse. When the assessments were performed and more therapy regarding sexual abuse was suggested, neither Linda nor Richard sought the therapy.
A.A. and B.B. were initially taken from Richard and Linda's home due to a report that their son J.A. had sexually abused A.A. After A.A. was seen at the hospital when the incident was reported, Richard and Linda were allowed to take A.A. and B.B. home but were specifically informed that J.A. should not be left with the girls unsupervised. However, Linda allowed J.A. to sleep in the same room with the girls that very night.
When the custody of the girls was given to DCFS, Richard and Linda were told that part of their service plan required J.A. to submit to an assessment to determine the likelihood of him reoffending and for sexual-offender-specific counseling. However, when J.A. went to the assessment, he became upset and Linda stopped the assessment and allowed J.A. to leave. *833 Linda and Richard have not taken the responsibility to see that J.A. receives the therapy he needs. In fact, they refused to lock J.A. out of the house so that DCFS could insure that he received needed sex offender treatment.
Richard stated in his assessment that he did not believe that J.A. had abused A.A. Linda stated that she also did not believe that J.A. abused A.A. In fact, she indicated that she was not sure that A.A. was telling the truth. Linda testified at the hearing that she is still not sure that J.A. did anything wrong.
Although A.A. and B.B. had been removed from their home and Gary Crone had informed Richard and Linda that J.A. living in their home posed a risk to both the girls, at the time of the hearing on the petition J.A. was still living in Richard and Linda's home. We conclude that this behavior by Linda and Richard supports the trial court's conclusion that they have not maintained a reasonable degree of interest, concern, or responsibility as to the welfare of A.A. and B.B. Therefore, we find that the trial court's finding of unfitness on this ground was not against the manifest weight of the evidence.
The second ground relied upon by the trial court for the termination of parental rights was that Linda and Richard failed to make reasonable efforts to correct the conditions which were the basis for the removal of the children and/or that they failed to make reasonable progress toward the return of the children within nine months after the adjudication of abuse and neglect under the Juvenile Court Act of 1987 (705 ILCS 405/1-1 et seq. (West 1998)). Each of these are distinct bases upon which removal may be premised. See In re C.M., 305 Ill.App.3d 154, 163-64, 238 Ill.Dec. 422, 711 N.E.2d 809 (1999).
The removal of the girls was based upon the report of the sexual abuse of A.A. by J.A. However, after the incident, Richard and Linda allowed J.A. to sleep in the same room with the girls. They also refused to lock J.A. out of the house, interrupted the assessment recommended by DCFS to determine the likelihood of reoffense by J.A., and did not see to it that J.A. received the therapy he needed to deal with his sexual abuse of A.A. In addition, during the time that DCFS had custody of the girls, there was evidence of inappropriate individuals living in Richard and Linda's home. Linda and Richard also failed to receive all of the therapy recommended by DCFS to deal with sexual abuse in the home and how to protect the children from sexual abuse. For these reasons, we conclude that the trial court's finding that Linda and Richard failed to correct the conditions which resulted in the removal of A.A. and B.B. was not against the manifest weight of the evidence.
In addition, the trial court found that Linda and Richard failed to make reasonable progress toward the return of the girls within nine months after the adjudication of neglect and abuse. This determination is an objective standard applied by the trial court, focusing on the amount of progress toward the goal of reunification that can be reasonably expected under the circumstances. See In re C.M., 305 Ill.App.3d at 164, 238 Ill.Dec. 422, 711 N.E.2d 809. "[T]he standard by which progress is to be measured is parental compliance with the court's directives, the service plan, or both." In re L.L.S., 218 Ill.App.3d 444, 463-64, 160 Ill.Dec. 804, 577 N.E.2d 1375 (1991).
After the minors were adjudicated neglected and abused and were made wards of the court, the court ordered Linda and Richard to attend and complete counseling for the prevention of sexual abuse and to make sure that J.A. completed sexual abuse counseling. In addition, the detailed *834 service plan set forth earlier required J.A., Linda, and Richard to do several things.
As discussed above, the requirements of the court and DCFS in this case were not met, and reasonable progress toward the return of the girls was not made within nine months of the adjudication of abuse and neglect. Linda and Richard have summarily failed to meet these requirements by failing to attend counseling, allowing J.A. to stay in their home, refusing to submit to assessments until years after they are recommended, and not taking responsibility for getting sex offender therapy for J.A. Therefore, the trial court's finding on this basis was not against the manifest weight of the evidence.
Finally, the court found that Linda and Richard failed to protect A.A. and B.B. from conditions in their environment which were injurious to their welfare. The record shows that J.A. was not removed from the home, that other persons who could be considered a danger to the girls were allowed to live in the home, and that J.A., Linda, and Richard have all failed to receive the proper therapy to deal with sexual abuse in the home. In fact, the counselor who worked with Linda for over 1½ years still does not believe that Linda is capable of protecting the girls from sexual abuse. Hence, we conclude that the trial court's finding on this basis is not against the manifest weight of the evidence.
Richard and Linda argue that we should reverse the trial court's ruling because the State failed to prove the sexual abuse of A.A. by evidence admissible at a termination hearing. The State argues that Richard and Linda admitted to the juvenile petition, which contained the allegation of sexual abuse, and that A.A. and B.B. were neglected and abused and that therefore the abuse did not have to be proven. In deciding this issue, we must determine whether our supreme court's decision in In re M.H. applies to the facts of our case and, if so, whether the holding in that case requires a reversal of the termination of Richard and Linda's parental rights. In In re M.H., the court considered "whether due process requires a circuit court to first determine whether a factual basis exists for a parent's admission of unfitness." In re M.H., at 363, 256 Ill.Dec. at 303, 751 N.E.2d at 1140.
Initially, we conclude that the facts of the In re M.H. case are distinguishable from the facts in the case at bar. In In re M.H., the parent admitted to the allegations of a petition to terminate parental rights, and the court accepted that admission without hearing any factual basis for the admission. In re M.H., at 358-360, 256 Ill.Dec. at 300-302, 751 N.E.2d at 1137-1139. The court held:
"[D]ue process requires a circuit court to determine whether a factual basis exists for an admission of parental unfitness before it accepts the admission. A factual-basis determination safeguards against an erroneous deprivation of respondent's fundamental right to parent her children. Further, such a requirement does not impose any increased burden on the State[] but fosters just and accurate decisionmaking." In re M.H., at 368, 256 Ill.Dec. at 305-306, 751 N.E.2d at 1142-1143.
Thus, in the In re M.H. case, the court found due process lacking where parental rights were terminated without any factual basis for the termination. The supreme court, in affirming the appellate court's reversal of the parental termination, emphasized, "[N]o facts were elicited at the hearing pertaining to respondent's unfitness, and the supplemental petitions [to terminate parental rights] contained only general allegations." In re M.H., at 360-361, 256 Ill.Dec. at 302, 751 N.E.2d at 1139. The facts in In re M.H. concern the *835 State's request to permanently deprive parents of their fundamental and sacred liberty interest in the care and custody of their children and concern the trial court's failure to adequately determine that a basis in fact existed to terminate the fundamental and sacred liberty interest of the parents. In contrast, the facts in the case at bar clearly establish that the parents were provided with a full and complete evidentiary hearing before the termination of their rights. The trial court then concluded, after the above-referenced facts were proven by clear and convincing evidence, that Richard and Linda were unfit parents. Linda and Richard have continued to argue, however, that the facts that were proven by clear and convincing evidence at the termination hearing were still insufficient to determine parental unfitness because the original adjudicatory hearing was not transcribed and that therefore the record fails to show that more than five years ago, at the initial stage of this case (the adjudicatory hearing), adequate procedures were in place to protect the parents' due process rights.
"Prior to children being adjudicated wards of the court, the State must prove abuse, neglect[,] or dependence by a preponderance of the evidence." In re M.H., at 365, 256 Ill.Dec. at 304, 751 N.E.2d at 1141. Thus, we must first outline the procedures used in the case at bar before we can decide whether those procedures sufficiently protected Richard and Linda's due process rights.
Here, at the adjudicatory hearing, the parents admitted the allegations of the petitionthat A.A. had been sexually abused by her brother, J.A. Richard and Linda point out in their brief that the record on the juvenile petitions is incomplete because there is no transcript from the hearing in which A.A. and B.B. were adjudicated abused and neglected. However, the trial court's order of adjudication stated that the court accepted Richard and Linda's admissions, and the allegations they admitted are clearly set forth in the juvenile petitions. Although we find the lack of a transcript in this case to be harmless, we take this opportunity to express our belief that a court reporter should be present to preserve the testimony presented at adjudicatory hearings.
Moreover, although there is no transcript of this hearing, the lack of a transcript does not control here where, in later proceedings, the factual basis for the initial adjudication was set forth in relatively great detail. At the hearing on the petition to terminate parental rights, Crone, a DCFS child welfare specialist, testified about the reported incidence of sexual abuse by J.A. Crone also testified that A.A. and B.B. were allowed to return home with their parents after the incident but that Linda then allowed J.A. to sleep in the same room with both A.A. and B.B. Crone testified that it was the incident of the mother allowing the suspected sexual molester to sleep in the same room with the children that caused the girls to be adjudicated abused and neglected.
The supreme court, in its analysis of whether due process allows parental rights to be terminated without a factual basis, relied upon the United States Supreme Court decision in Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). In Mathews, the Court identified three factors that should be considered when determining what due process requires:
"(1) the private interest affected by the official action; (2) the risk of an erroneous deprivation of the interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the government's interest, including the function involved and the fiscal and administrative *836 burdens that the additional or substitute safeguards would entail." In re M.H., at 362-365, 256 Ill.Dec. at 303-304, 751 N.E.2d at 1140-1141 (citing Mathews, 424 U.S. at 335, 96 S.Ct. at 903, 47 L.Ed.2d at 33).
In the case at bar, the private interest is the same as in the In re M.H. case: the interest of parents in the control, custody, and care of their childrena fundamental interest that will not be terminated or restricted lightly. In re M.H., at 365-366, 256 Ill.Dec. at 304-305, 751 N.E.2d at 1141-1142.
The risk of an erroneous temporary deprivation of this right, however, is not quite the same as the risk involved in a permanent termination proceeding like the one in In re M.H., After the initial, adjudicatory stage of the proceedings, the parents have numerous opportunities over a lengthy period of time to regain the custody of their children. In contrast, after the order terminating parental rights is filed, the parents' only avenue of redress is with the courts of review. Because the risk of an erroneous deprivation involves a much greater loss with much less ability to correct any errors, the proof required at the two stages of the proceedings is also different. At the initial, adjudicatory stage, the State must prove the right to remove the children from the parents' custody by a preponderance of the evidence. At the termination stage, the State must prove the parents to be unfit by clear and convincing evidence. The difference in the level of proof necessary at each stage is relevant to the issue before us today, because if an adjudication is proper with only a preponderance of the evidence, then a lower level of proof, by way of a parental admission together with facts of record demonstrating the factual basis for the initial removal, is sufficient to protect the parents' due process rights at that stage of the proceedings. Since the risk of an erroneous deprivation is lower at the adjudicatory stage than at the termination stage, there is no due process right to any additional procedural safeguards over and above those already in place herein.
The final factor to consider, the government's interest, is twofold at both the initial, adjudicatory stage and at the later, termination stage: first, the government's parens patriae interest in preserving and promoting the child's welfare and, second, the fiscal and administrative interest in reducing the cost and burden of such proceedings. The first interest, the parens patriae interest in preserving and promoting the child's welfare, is the same at both stages. In re M.H., at 367-368, 256 Ill. Dec. at 305-306, 751 N.E.2d at 1142-1143. However, since the proof necessary for the adjudication is lower than that necessary for a termination, the fiscal and administrative interest in reducing the cost and burden of such proceedings is of more importance at the initial stage than at the final, termination stage. Here, the trial court at the adjudicatory phase had the parents' admission that A.A. had been sexually abused by her older brother. At the termination proceeding, more evidence was presented about the factual basis for the adjudication: hospital personnel assessed A.A. after the alleged sexual abuse, and A.A. went home with her parents, who had been warned that A.A. and B.B. should not be left alone with J.A., but the parents allowed J.A. to be unsupervised with A.A. and B.B. overnight. This evidence is clearly sufficient to prove, by a preponderance of the evidence, that the court's initial decision adjudicating the children as abused was not against the manifest weight of the evidence. To require more at this early stage of the proceedings would not add any protection to the primary interest at the first stagethe welfare of the children. The number of adjudicatory hearings in our state's more *837 populous counties would far exceed the number of termination proceedings, and there is an overwhelming government interest in expediting these adjudicatory proceedings to "act in a just and speedy manner to determine the best interests of the minor, including providing for the safety of the minor." 705 ILCS 405/2-14(a) (West 1998).
Therefore, we hold that a sufficient factual basis for the adjudication was presented to the court by way of the parents' admission at the adjudicatory hearing and the additional evidence presented at the termination hearing. The due process rights of the parents herein were not violated by this procedure.

CONCLUSION
For the foregoing reasons, we affirm the trial court's order terminating the parental rights of Linda A. and Richard A. to A.A. and B.B.
Affirmed.
HOPKINS and WELCH, JJ., concur.