NOS. 4-02-0909, 4-02-0910 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

In re: JACOB K., a Minor,

THE PEOPLE OF THE STATE OF ILLINOIS,

          Petitioner-Appellee,

          v.   (No. 4-02-0909)

MELISSA FAULKNER,

          Respondent-Appellant.

______________________________________ 

In re: ALIXANDRA F., a Minor

THE PEOPLE OF THE STATE OF ILLINOIS,

          Petitioner-Appellee,

          v.   (No. 4-02-0910)

MELISSA FAULKNER,

          Respondent-Appellant.

)

)

)

)

)

)

)

)

)

)

)

)

)

Appeal from

Circuit Court of

Logan County

No. 00JA13

    

No. 00JA14    

Honorable

Charles M. Feeney, 

Judge Presiding.

_____________________________________________________________

JUSTICE APPLETON delivered the opinion of the court:

Respondent, Melissa Faulkner, appeals from the order of the circuit court of Logan County finding her an unfit parent and terminating her parental rights.  Respondent argues (1) that the trial court violated her rights to due process, and (2) the trial court's findings were against the manifest weight of the evidence.  We reverse.

I. BACKGROUND

On March 2, 1999, the State filed a petition in Peoria County for adjudication of wardship with respect to respondent's minor children, Alixandra F. (born November 30, 1992) and Jacob K. (born March 16, 1996).  The petition alleged that Jacob was an abused minor in that his father, Wesley Kile (not a party to this appeal), hit Jacob in the face causing a bruise (count I) and that both Jacob and Alixandra were neglected minors in that their environment was injurious to their welfare based upon the above incident of abuse (count II).  On June 10, 1999, the trial court in Peoria County entered an order for shelter care.  The children remained at home with respondent.  At the shelter-care hearing, respondent admitted the allegations in the petition and agreed to keep the children away from Jacob's father. 

On September 9, 1999, the trial court entered a disposition­al order placing the children under the guardianship of the Department of Children and Family Services (DCFS).  The trial court found Jacob's father unfit based upon proof of the petition and his lack of cooperation with DCFS.  At the time, the trial court expressly reserved a ruling on respondent's fitness.  The court ordered both parents to cooperate with DCFS and to comply with the requirements contained in their client service plans.  Respondent's plan required that she (1) undergo a psychological evaluation, following all recommendations contained therein, (2) engage in individual counseling for domestic battery and sexual abuse, (3) attend parenting classes, and (4) submit to random drug tests.  (The later requirement was apparently imposed only because respondent, an epileptic, suffered a seizure in open court.)  Respondent retained custody of both children.

In April 2000, respondent moved from Peoria County to Logan County; therefore, the case was transferred to Catholic Social Services (CSS) in Lincoln, Logan County, Illinois.  On April 17, 2000, after her move, respondent voluntarily relinquished custody of her children to DCFS.  Due to her epileptic seizures, respondent felt that she was unable to properly care for the children.

On November 5, 2001, the State filed a petition to terminate respondent's parental rights, alleging she was an unfit parent pursuant to section 1(D)(m)(iii) of the Adoption Act (750 ILCS 50/1(D)(m)(iii) (West 2000)) in that she failed to make reasonable progress toward the return of the children during any nine-month period after the end of the initial nine-month period following the adjudication of the children as neglected or abused minors under section 2-3 of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3 (West 2000)).

On March 14, 2002, respondent filed a motion to dismiss the State's termination petition, alleging that because the trial court did not find respondent unfit as required by section 2-27(1) of the Juvenile Court Act (705 ILCS 405/2-27(1) (West 2000)) in the order of adjudication, the court could not proceed on the petition to terminate.  On March 14, 2002, at the hearing on respondent's motion, the trial court denied respondent's request for relief.

On March 14, 2002, the trial court began to hear evidence on the State's petition to terminate.  Bambi Downing, the CSS caseworker, testified that she received this case from DCFS upon respondent's move from Peoria to Lincoln in April 2000.  When Downing received the case, respondent had recently given birth to her third child, whom she gave up for adoption.  Respondent had also already completed the court-ordered psychological evaluation.  Downing testified that respondent visited her children regularly.  In August 2000, respondent moved to Connecticut after she was evicted from her apartment in Lincoln because of her inability to pay rent.  After respondent's move, Downing contacted an investigator with the Connecticut Department of Children and Families, who informed her that respondent was homeless.  Downing was unable to contact respondent from mid-July through mid-November 2000.  Because of the lack of communication, Downing rated respondent's progress unsatisfactory on her February 19, 2001, service plan.  Respondent's reason for moving to Connecticut was to reconnect with her birth mother and to seek treatment for her epilepsy at the Epilepsy Research Foundation in Connecticut.  Because respondent was involved with the epilepsy foundation, Downing gave respondent a satisfactory rating on her service plan pertaining to treatment.

Downing testified that respondent had begun, but had not completed, domestic-violence counseling and parenting classes while living in Lincoln.  Downing told respondent that CSS would contact the Interstate Compact Unit in Connecticut to help her with services there.  However, Downing later learned that the Interstate Compact Unit was only for children's services.  Downing told respondent that she would have to seek out services on her own.  Downing contacted respondent's counselor in Connecticut, who reported to Downing that respondent initially failed to keep her appointments but had not missed any in the last couple months.  Downing also received confirmation that respondent had successfully completed an eight-week parenting class in July 2001.  Downing rated respondent unsatisfactory on her domestic-violence counseling objective.

Downing testified that respondent stayed in touch with her children initially through weekly telephone visits facilitated by CSS.  No telephone visits occurred between mid-July through mid-November 2001, when Downing lost contact with respondent.  Respondent later informed Downing that she was homeless and without a phone during that time.  Kerri McAvay, a caseworker with the Epilepsy Foundation of Connecticut, contacted Downing and informed her that respondent wanted to resume the telephone visits with her children.  Downing agreed.  Downing testified that she discussed with respondent the necessity of completing the tasks required by her service plan or she risked having her parental rights terminated.

 Although she knew respondent had applied for federal and state assistance and had worked several jobs, Downing rated respondent unsatisfactory on the requirement of obtaining a legal source of income because Downing had not received proof from respondent.  Downing admitted that some of the unsatisfactory ratings were due to her inability to verify the facts.  Downing admitted she did not ask McAvay for assistance in verifying information. 

Respondent testified she had suffered from epilepsy since she was a child. Respondent suffered seizures despite taking medication and therefore was prevented from driving, maintaining employment, and caring for her children.

Respondent moved from Peoria to Lincoln near her ex-husband, Alixandra's father, and his wife, Michelle.  In April 2000, respondent voluntarily placed her children with DCFS due to her epilepsy problems.  DCFS placed Jacob in the foster care of Wayne and Kathy Boatman and Alixandra with her father.

In August 2000, respondent moved to Connecticut with the hope that she would receive better medical treatment.  She had received treatment in Connecticut as a child.  She testified that she left her children in Illinois because she did not know what to expect in Connecticut, worried about their stability, wanted to avoid the dislocation from their fathers, and felt it was in their best interest to stay together in Illinois.

Respondent lived with her mother for only one month in Connecticut.  Respondent described her mother as mentally ill.  She then lived in an apartment and worked at various jobs.  In February 2001, respondent gave birth to a boy, her third child.  Respondent gave him up for adoption because she felt she was unable to properly care for him.  At the time, she was homeless and without access to a phone.  However, while she was homeless, she completed the parent­ing classes ordered by the trial court.

In August 2001, respondent contacted the Epilepsy Foundation of Connecticut and was assigned to a caseworker, Kerri McAvay.  McAvay helped respondent get appropriate medical care with a specialist at Yale Medical Center, established counseling services, and arranged for respondent to receive public assistance.  Respondent met a friend, Danny Patton, with whom she began to live.  With her medical condition under control, respondent was hopeful of moving back to Illinois and regaining custody of her children.  During her stay in Connecticut, respondent remained in contact with her children through telephone visits arranged by CSS.

Respondent had made great strides with her medical treatment and completed her family and domestic-violence counseling.  Respondent admitted that she had been dropped by an individual counselor due to missed appointments but then successfully sought treatment from another counselor.  

Respondent testified she planned to return to Illinois.  She admitted that it might take up to six months to return, but she wanted to get her financial and medical assistance in place before returning because she did not want to recreate the problems she had in Illinois and be left with no source of income and no housing.  

After considering the evidence and arguments of counsel, the trial court found that respondent had failed to make reasonable progress toward the return of the children during any nine-month period after the end of the initial nine-month period following the adjudication of neglected or abused minor under section 2-3 of the Juvenile Court Act.  The trial court stated, "This is not a case about reasonable efforts.  There's no assertion made that mom failed or didn't fail either way to make reasonable efforts.  This is about whether reasonable progress was made."  The trial court found respondent lacked credibility.  The court also questioned the quality of work done by CSS and DCFS, but stated, "This isn't their child.  This is the mother's child, and it is incumbent upon the parents to step up to the plate and perform.  That is what is required, period."  The trial court found respondent unfit pursuant to section 1(D)(m)(iii) of the Adoption Act.  The court's order included the following:  

"This finding is based upon lack of adequate housing since the [dispositional] order, lack of progress on individual counseling, failure to complete domestic[-]battery and parenting classes in a timely manner, the mother's own statement that she will not be ready to resume parental responsibilities for [six]     months to one year from today, and her recognition of her unfitness as evidenced by her surrender of two children since the [dispositional] order and her statement today describing herself as unfit." 

On October 24, 2002, the trial court conducted a best-interest hearing.  Downing testified that Alixandra was initially placed with her father and his wife, Michelle, and their son.  After two months, Alixandra's father and his wife requested Alixandra be placed in another foster home while they searched for a larger home.  They had difficulties in having Alixandra share space with their son.  Alixandra was placed in the Boatmans' home, with her brother, Jacob, for 15 months.  After her father purchased a larger home, she moved in with him and his wife.  Alixandra was doing well in their care.  They expressed a desire to adopt her.  Jacob was doing well in foster care with the Boatmans, who expressed a desire to adopt him as well.  

Downing had recently spoken to the children about their mother.  Alixandra wanted to visit her mother more often, and Jacob wanted the visits to continue.  Downing testified that respondent and her children showed a great deal of affection for each other.  Their phone visits lasted a full hour and the children talked about school, their friends, and Jacob loved to tell his mother jokes.  The children apparently enjoyed talking with their mother.  Downing opined that although respondent had maintained interest in her children, she had failed to make reasonable progress toward the children's return. 

 Linda Lobue, from the Illinois Epilepsy Resource Center, testified that she was working with respondent and McAvay to obtain housing, public assistance, and medical care for respondent in Springfield, Illinois.  She testified she had been with respondent when she visited with her children in March 2002.  She said the children "jumped out of the car and ran over to [respondent] calling her [']mommy['] and hugged her and were extremely excited to see her."  She further stated that respondent had returned to Illinois and was staying at a shelter in Springfield until she could obtain other housing.  When asked why respondent did not get these services in the past, Lobue replied, "Well, [to] access services you either need to be able to drive back and forth or get a ride back and forth, and that's a problem if you don't drive or you don't have a car.  We run into that all the time with our clients who live in rural communities or rural areas getting to services because you don't--you don't just go once and it's set up.  You have to go back and forth."

Respondent testified that she had recently moved to Springfield, Illinois, and was temporarily living in a shelter.  Her move was delayed due to the necessity of emergency surgery that she underwent in Connecticut.  Respondent expressed her concern that the children were not living together.  She felt her children were bonded to her; however, she knew she needed a reliable income to be able to raise them properly.  The trial court found that it was in the children's best interest to terminate respondent's parental rights.  This appeal followed. 

 II. ANALYSIS

Respondent contends that the trial court violated her due process rights under the state and federal constitutions (U.S. Const., amend. XIV; Ill. Const. 1970, art. I, §2) by failing to determine whether she was unfit or unable to care for her children pursuant to the Juvenile Court Act (705 ILCS 405/2-27(1) (West 2000)) at the time of the September 1999 dispositional hearing.  Respondent argues that the failure to make a judicial finding of unfitness under the Juvenile Court Act precludes the operation of the termination test found in section 1(D)(m)(iii) of the Adoption Act.  750 ILCS 50/1(D)(m)(iii) (West 2000).

We first address the appropriate standard of review.  Ordinarily, a circuit court's finding as to fitness is afforded great deference on review.  The circuit court is in the best position to make factual findings and to assess credibility of witnesses; accordingly, a reviewing court will only reverse a circuit court's ruling if it is against the manifest weight of the evidence.  
In re Adoption of Syck
, 138 Ill. 2d 255, 274, 562 N.E.2d 174, 183 (1990).  However, in this case, the question on appeal is not whether the trial court's ruling of fitness was correct based upon the testimony or factual findings, but whether the trial court followed the proper procedures to properly afford respondent the process she was due.  The question presented is a question of law and will be reviewed 
de
 
novo
.  
In re M.H.
, 196 Ill. 2d 356, 361, 751 N.E.2d 1134, 1139 (2001).

Sections 2-21 and 2-22 of the Juvenile Court Act govern the trial court's actions at the adjudicatory and dispositional hearings respectively.  705 ILCS 405/2-21, 2-22 (West 2000).  Neither statutory section requires the trial court to determine a parent's fitness prior to the dispositional hearing.  According to section 2-21(5) (705 ILCS 405/2-21(5) (West 2000)), the trial court may determine that a parent is unfit if the evidence presented at the adjudicato­ry hearing is clear and convincing to that fact.  The provision is a permissive, not a mandatory, requirement.  Based upon the applicable statutory sections, respondent's argument that the trial court erred in failing to determine her fitness prior to the September 1999 disposition­al hearing is without merit.

Respondent further argues that the trial court erred in failing to determine respondent's fitness at the time the minors were placed outside the home.  Until April 17, 2000, the minors remained with respondent.  On that date, respondent voluntarily surrendered the minors to DCFS and they were placed elsewhere.  Respondent contends that because the children were placed outside of the home, the trial court was required to adjudge respondent unfit, unable, or unwilling to care for them pursuant to section 2-27(1) of the Juvenile Court Act.  Respondent claims that section 2-27(1) mandates that the trial court find a parent unfit or unable to care for his or her children whenever the court issues an order placing the children outside the home of the parent.  705 ILCS 405/2-27(1) (West 2000).  Respondent misconstrues the statute.

Section 2-27(1) allows the trial court to place the children outside of the home if it finds the parents are unfit, unable, or unwilling to care for the children and if it would be in the children's best interests.  705 ILCS 405/2-27(1) (West 2000).  The provisions of section 2-27(1) cannot be read in reverse.  The statute does not require the trial court to determine a parent's fitness before placing the children outside of the home.  Respondent's argument that the trial court erred in not making a fitness determination before placing the children outside the home is without merit as well.  The statute does not require the trial court to make such a finding. 

However, for reasons other than those argued by respondent, we find the trial court violated respondent's due process rights.  Section 2-29(1) of the Juvenile Court Act states that a minor who is the subject of abuse or neglect under this act may be the subject of a petition for adoption under the Adoption Act.  705 ILCS 405/2-29(1) (West 2000).  Section 2-29(2) requires a finding of unfitness under the Adoption Act before parental rights may be terminated.  705 ILCS 405/2-29(2) (West 2000).  At the hearing on the State's petition to terminate respondent's parental rights, respondent was found unfit pursuant to section 1(D)(m)(iii) of the Adoption Act for failing to make reasonable progress toward the return of her children during any nine-month period after the end of the initial nine-month period following the adjudication of neglected or abused minor under section 2-3 of the Juvenile Court Act.  750 ILCS 50/1(D)(m)(iii) (West 2000).

Due process requires sufficient notice to the respondent of not only her required tasks, but also a general idea of the time frame in which she needs to perform those tasks.  Respondent must be advised of a benchmark from which the trial court will measure her reasonable progress.  Without this, no basis arises on which to make an accurate assessment as to whether respondent made reasonable progress.  
In re Enis
, 121 Ill. 2d 124, 128, 520 N.E.2d 362, 364 (1988).

Proceedings to terminate parental rights must meet the requisites of the due process clause.  
In re J.B.
, 328 Ill. App. 3d 175, 187, 765 N.E.2d 1093, 1103 (2002).  Thus, we must determine whether due process required notification to respondent of the time frame in which she was to complete the tasks required by her service plan or notification of a benchmark from which the trial court could measure her progress of completing those tasks when she had already completely remedied the conditions that led to the court's intervention in her family.

The United States Supreme Court has identified three factors to be considered by courts in determining what the due process clause requires:  (1) the private interest affected by the official action; (2) the risk of an erroneous deprivation of the interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the government's interest, including the function involved and fiscal and administrative burdens that the additional or substitute safeguards would entail.  
Mathews v. Eldridge
, 424 U.S. 319, 334-35, 47 L. Ed. 2d 18, 33, 96 S. Ct. 893, 903 (1976).  Illinois courts have applied the 
Mathews
 factors in determining whether procedures followed in a termination-of-parental-rights proceeding satisfied the constitutional requirements of due process.  
In re A.A.
, 324 Ill. App. 3d 227, 239, 754 N.E.2d 826, 835-36 (2001).

First, it is well established that the interest of a parent in the control, custody, and care of her child is fundamental and will not be terminated lightly.  
M.H.
, 196 Ill. 2d at 365, 751 N.E.2d at 1141.  Thus, we are mindful that the private interest affected by government action is a fundamental right
 due the utmost protection.

Second, we consider the procedures utilized by the trial court in terminating respondent's parental rights.  We find those procedures, or in this case, the lack of procedures, led to an erroneous deprivation of respondent's fundamental right to the control, care, and custody of her children.

As of September 1999, respondent had remedied the condition that caused DCFS's involvement in the case, namely removing Jacob's father from the home.  Respondent had also engaged in many of the services and counseling sessions recommended in her service plan.  The record reflects that respondent went for individual counseling, had negative urinalyses, and had cooperated with DCFS.  Under these circumstances, respondent had no reason to anticipate that her parental rights would be terminated.  

In April 2000, due to her illness, respondent determined that she was unable to care for her children.  She recognized that she was having difficulty and voluntarily placed her children with DCFS on April 17, 2000.  She expected the placement to continue until she was able to get help in controlling her epilepsy.  Nothing in the record before us shows that respondent was advised of the consequences of relinquishing her children to DCFS or of any time frame within which she must reclaim them.  After voluntarily placing her children, respondent was given additional tasks to complete.  The record does not indicate that respondent was ever told that anything had changed regarding her case since the September 1999 dispositional hearing. 

One crucial purpose of the dispositional hearing after an adjudication of abuse or neglect is to give parents fair notice of what they must do to retain their rights to their children in the face of any future termination proceedings.  
In re Andrea F.
, 327 Ill. App. 3d 1072, 1076-77, 764 N.E.2d 1281, 1285 (2002).  Section 2-22(6) of the Juvenile Court Act provides that when a child is made a ward of the court, the trial court shall admonish the parents that they must cooperate with DCFS, comply with the terms of the service plans, and correct the conditions that require the children to be in care, or risk termination of their parental rights.  705 ILCS 405/2-22(6) (West 2000).  Respondent was so advised at the time, but she was never advised of anything different when the facts of her case changed.

Although testimony showed that after April 2000, CSS sent respondent her service plans and respondent was aware that she had tasks to complete, the record shows no actual notice given to respondent that she must complete her tasks by a certain time or risk losing her rights to her children.  Attached to each service plan was the following statement:

"I understand that [DCFS] will continue to work with me toward the goal of returning my child(ren) home as long as I make substantial progress toward correcting the conditions that require my child(ren) to be in care, as demonstrated by behavior changes that ensure the health, safety, and well-being of my child(ren), cooperate with [DCFS] and my agency caseworker, and comply with the terms of the service plan.

This means that if I fail to substantially fulfill my obligations under the service plan and correct the conditions that require my child(ren) to be in care, [DCFS] and/or Juvenile Court may decide that my child(ren)'s need for a permanent home requires a new plan.  This may include identifying a permanent home for my child(ren); and asking the court to terminate my parental rights."

The signature lines on each of the service plans were either blank or indicated respondent was not present at the hearing.  Without signatures, we cannot assume that respondent read and understood the above paragraphs.  Even if respondent had read the above information, the language in the paragraph such as "may decide" and "may include" is not adequate to put respondent on notice that she risked losing the parental rights to her children, especially since she already corrected the conditions that required the children to be made wards of the court.  She had already kept her children from having any contact with Jacob's father. 

Respondent's service plan dated September 14, 2001, stated a planned achievement date of March 31, 2002.  Respondent could reasonably assume in September 2001 that she had until March 2002 to complete the tasks in the service plan.  The State filed its petition to terminate her parental rights in November 2001.  The record reflects that respondent did not complete some of her service-plan tasks until she received notice of the petition to terminate her parental rights.

The trial court found respondent unfit for failing to make reasonable progress toward the return of the children during any nine-month period after the end of the initial nine-month period following the adjudication of neglected or abused minor under section 2-3 of the Juvenile Court Act.  The determination of reasonable progress involves an evaluation of progress measured against the conditions that led to the child's removal or any conditions newly arising that might warrant continuing custody of the child in DCFS.  
In re F.S.
, 322 Ill. App. 3d 486, 491, 749 N.E.2d 1033, 1038 (2001).  When the conditions change so substantially, the admonishments given at the dispositional hearing can be insufficient to give adequate notice to respondent of not only what needs to be done but also how long she has to get the job done.  In the case 
sub
 
judice
, nothing in the record  indicates that respondent was advised of what needed to be done and when it needed to be done to avoid permanently losing her children after she had already remedied the condition that led to the children's adjudication.  Respondent had already complied with the tasks in her service plan; and therefore, she had no reason to believe that her parental rights were in jeopardy of being terminated until the petition was filed.

As for the third 
Mathews
 factor, we find that there would not have been an undue burden on the government in informing respondent of her rights and the consequences of her actions after she relinquished her children to the custody of DCFS in April 2000.  The additional safeguards that a hearing would have provided far outweigh the administrative burdens the government would have shouldered.  Since the State is concerned with the welfare of the child, it shares the parent's interest in a correct and just decision.  
M.H.
, 196 Ill. 2d at 367, 751 N.E.2d at 1142.  Respondent should have been advised that the clock was running and that the statute required compliance within a certain time frame or she risked losing her rights to her children despite her initial compliance. 

Accordingly, applying the 
Mathews
 balancing test, we find that due process requires the trial court to advise respondent of the tasks that she was required to complete and the time frame within which she was required to complete them to avoid losing her parental rights when she had already corrected the conditions that led to the adjudication of neglect.  So advising her would avoid an erroneous deprivation of her fundamental right to parent her children.  Further, such a requirement would not impose any increased burden on the State, but would foster just and accurate decision making.  See 
M.H.
, 196 Ill. 2d at 368, 751 N.E.2d at 1143.   In view of our resolution of this issue, we need not address her second issue.

III. CONCLUSION

For the reasons stated, we reverse the trial court's order terminating respondent's parental rights.

Reversed.

KNECHT, J., concurs.

McCULLOUGH, J., dissents.

JUSTICE McCULLOUGH, dissenting:

I respectfully disagree only with that portion of the order of the majority that reverses the trial court based upon 
Mathews
.

In the dispositional order entered September 9, 1999, the children were placed in the guardianship of DCFS with the right to place.

A permanency review order was entered on December 30, 1999.  Respondent delivered a third child in February 2000 and placed that child for adoption.  The respondent relinquished control of Jacob K. and Alixandra F. on April 17, 2000.  The review report of June 22, 2000, set further specific tasks for respondent, including an agreement to have a psychological evaluation, to complete domestic violence counseling, to complete parenting classes, and to provide random urine drops twice a month.  The permanency review order of June 22, 2000, transferred venue to the circuit court of Logan County, Illinois.  A permanency review order entered September 14, 2000, stated counseling, evaluations, and classes needed to be completed by respondent.  Review-hearing reports had also been filed July 24, 2000, and August 20, 2000.

It is important to state again the trial court's July 18, 2002, order, stating its filing of unfitness was based upon: 

"lack of adequate housing since the [dispositional] order, lack of progress on individual counselling, failure to complete 

domestic[-]battery and parenting classes in a timely manner, the mother's own statement that she will not be ready to resume parental responsibilities for 6 months to one year from today, and her recognition of her unfitness as evidenced by her surrender of two children since the [dispositional] order and her statement today describing herself as unfit.  Further basis [
sic
] were stated on record."

I believe the trial court should be affirmed.  The majority finds that due process was not provided the respondent based upon the factors set forth in 
Mathews
.  I submit that due process was provided respondent.  She was fully aware, by the many review hearings and orders of the trial court, that her parental rights were the concern.  Although her own physical and mental problems may have contributed to her unfitness, they are not to be disregarded when determining fitness.

The majority determines that under the circumstances of this case, "respondent had no reason to anticipate that her parental rights would be terminated."  Slip op. at 15.  I disagree.  The children have been in the guardianship of DCFS since September 9, 1999, and have been in stable foster care since April 2000, more than two years prior to the fitness hearing.  When children are placed with DCFS, the parents are admonished to comply with their service plans or risk termination of their parental rights.  705 ILCS 405/2-22(6) (West 2000).  Permanency review hearings were held on a regular basis involving respondent.  The circumstances of this case make it clear respondent did have reason to anticipate and know that her parental rights could be terminated.

 The trial court should be affirmed.