*In re* ESTATE OF JAMES STANMORE DOOLEY LANGFORD, Incompetent.—(WALTER E. BILLERMAN, Petitioner-Appellant, *v.* JAMES STANMORE DOOLEY LANGFORD, Respondent-Appellee.)

Fourth District No. 13595

Opinion filed June 27, 1977.

624

Richard C. Hayden and Stephen L. Corn, both of Craig & Craig, of Mattoon, for appellant.

Stephen Davis, of Charleston, for appellee.

Mr. JUSTICE HUNT delivered the opinion of the court:

This is an appeal from an order of the circuit court of Macon County denying a petition of Walter E. Billerman, petitioner-appellant, for the appointment of a conservator over the person and the estate of James Langford, an alleged incompetent, respondent-appellee.

On September 17, 1974, Billerman filed a petition for the appointment of a conservator over the person and the estate of Langford. The petition prayed that Langford be declared an incompetent, that his father be made conservator of his person and that the Central National Bank of Mattoon, Illinois, be appointed conservator of his estate.

At the first hearing, on September 26, 1974, Langford failed to appear either in person or by counsel. A guardian ad litem was appointed. After hearing evidence, the court appointed William R. Mattson as temporary conservator of the person, and the Central National Bank of Mattoon as temporary conservator of the estate. Concurrently, a writ of injunction was issued prohibiting Langford from selling or disposing of any of his property or from leaving the jurisdiction of the court pending a final disposition of the petition. The court also directed that Langford submit to psychological examination.

Subsequent evidentiary hearings were held on April 15, 1975, and May 26, 1975, at which the respondent, his attorney, and the guardian ad litem were all present. On April 15, 1975, Dr. Philipp Borstein, who had twice

previously examined respondent at the direction of the court, testified for Billerman. At a May 1975 hearing, the respondent, Dr. Dale Sunderland, and Dr. Michael Campion testified for Langford. The court thereafter found Langford capable of managing his own affairs, dissolved the injunction, dismissed the temporary conservator, and denied the petition for appointment of a conservator. A motion by Billerman to modify the decree was denied and he appeals.

Billerman seeks a reversal of the decree of the trial court on the grounds that the findings were contrary to the manifest weight of the evidence on the question of the alleged mental illness and that the trial court did not give adequate consideration to the claim that Langford is a spendthrift and about to divest himself of all of his assets. A court of review may not substitute its judgment for that of the trial court unless those findings are contrary to the manifest weight of the evidence. (*Schulenburg v. Signatrol, Inc.* (1967), 37 Ill. 2d 352, 226 N.E.2d 624.) However, where a judgment is palpably wrong, it is the duty of the reviewing court to set it aside. (*Owen v. Pret' A Porter Boutique, Inc.* (1973), 15 Ill. App. 3d 438, 302 N.E.2d 672.) It is necessary, therefore, to review the testimony of the witnesses.

At the first hearing, Langford's mother, Mrs. Dorothy Langford, testified that her son had attended law school and was admitted to practice in two states. A few years after graduating from law school, in 1965, Langford was touring in Mexico and was involved in a very serious automobile accident resulting in unconsciousness and some brain damage. Langford's mother testified to a distinct change in personality following the accident and his long convalescence. He had been a very happy and pleasant person, but now was very depressed and very unpleasant to be around.

His mother further testified that Langford was never gainfully employed from the time of the accident and convalescence until the time of the hearing, a period of approximately eight years. He was, on one occasion, involved in a disorderly fracas, and it was necessary for her to take him to Galveston, Texas, and place him under the care of Dr. Martin Towler, a psychiatrist. Dr. Towler had Langford under medication and in a hospital, but Langford left the hospital without the consent of the doctor. Langford later broke completely with his parents.

Concerning Langford's property, Mrs. Langford testified that he had inherited real estate from his grandfather. The land was located in Texas and New Mexico and consisted of over 5,000 acres. She testified that while her son resided in Virginia Beach, Virginia, he sold between one and two thousand acres of his estate, the reasonable value being between $75 and $100 per acre. She received a call from him in the latter part of June 1974 wherein he stated that he had become very impressed with a

religious group called "Christ is the Answer." In a subsequent conversation in August of 1974, he advised her that the organization had moved to Washington, D.C., and that he was going to sell his house and land and dispose of his estate and give the proceeds to this organization. She further testified that he had given the organization an automobile. Langford's only income over the years since 1965 had been from rentals of his ranch land at approximately two dollars per acre. Respondent had no other income from any other source.

At the second evidentiary hearing held April 15, 1975, testimony was received from Dr. Philipp E. Borstein. He testified that at the initial interview, Langford advised him that the value of his estate was from $150,000 to $200,000 and that he wished to sell his property and give it all to the evangelistic movement. Langford felt that this was part of his religious persuasion, having been recently converted to the belief that he should give his property away. He also advised the doctor that in the summer of 1974 he had given this organization the sum of $50,000. Dr. Borstein stated that from the medical records furnished to him he found that Langford had a possible post-concussion syndrome, and a post-trauma brain syndrome which constituted irreversible, or partial irreversible, brain damage. The doctor further stated that he was particularly impressed with Langford's lack of facial expression during the two interviews, and that he was also struck that Langford was obsessed with his religious beliefs to the point where he was totally preoccupied with this singular subject. Langford went into lengthy discussions concerning a Bible passage explaining why he should dispose of his estate. The doctor indicated that Langford's compelling desire to divest himself of his assets approached a delusional form. Based upon the above testimony, Dr. Borstein diagnosed Langford's illness as schizophrenia effective type, mildly excited. He also found there was a possibility of a mild chronic organic brain syndrome.

The third evidentiary hearing was conducted on May 26, 1975. Dr. Campion testified that he is a psychologist and that he had twice examined Langford. After an October 1974 examination, he concluded that Langford was not able to make a decision regarding his estate. However, he saw Langford again on May 20, 1975, for purposes of another evaluation. The witness testified that there was a movement toward normalcy which put Langford in the normal range of emotional stability and, as of that time, Langford did not exhibit psychosis, neurosis, or a personality disorder; he was in touch with reality and able to make coherent decisions. On cross-examination, Dr. Campion testified that he did find as a result of both examinations that Langford was susceptible to the suggestion of others.

Dr. Dale W. Sunderland was called by Langford. He gave an opinion that Langford was capable of managing his own estate and that there was

no evidence of psychosis, but there was evidence of neurosis. Dr. Sunderland stated that Langford's judgment was questionable, he was slightly paranoid insofar as he was suspicious, that he had a schizoid personality with depressive features and a past history of psychotic depression that could possibly reoccur.

Langford then took the stand in his own behalf. He stated that he was 41 years of age, currently associated with "Christ is the Answer" which he described as a "forsake all, active witnessing, international, traveling tent evangelistic ministry." He recalled working for Bank of America and American President Lines and that he had done some traveling and subsequently had a nervous breakdown. He said that he began a conscious search for God. He said that so far as his membership in the religious group was concerned, he does what he is told to do by his foreman. He admitted that he now wants to give his estate away and that he had been using his trust fund to sustain himself. He felt that he was giving money to the Lord and that "Christ is the Answer" was the vehicle. On cross-examination, he testified that he had already given in the vicinity of $50,000 to the organization.

■■■ Section 112 of the Probate Act (Ill. Rev. Stat. 1973, ch. 3, par. 112) stated:

> "An 'incompetent' under this Act includes any person who because of insanity, mental illness, mental retardation, old age, physical incapacity, or imperfection or deterioration of mentality, is incapable of managing his person or estate and any person who, because of gambling, idleness, debauchery or the excessive use of intoxicants or drugs, so spends or wastes his estate as to expose himself or his family to want or suffering."

It is not necessary under either of the two above provisions that Langford be declared mentally ill resulting in a total lack of capacity to manage his affairs. A mild form of mental illness may make a person highly susceptible to certain emotional appeals and incapable of making rational decisions concerning the disposition of his income or his estate. This could constitute waste of his estate and subject him to want and suffering even though the objects of his bounty might be deemed to be engaged in worthwhile spiritual or religious activities. The test is incapability to manage one's own affairs so that waste and suffering are inevitable.

The Illinois Supreme Court stated in *In re Stevenson* (1970), 44 Ill. 2d 525, 531, 256 N.E.2d 766, 769, *appeal dismissed*, 400 U.S. 850:

> "This provision of the Probate Act is concerned with the appointment of a conservator for a person who for any of the reasons enumerated in the statute is incapable of managing his person or estate. The justification for the appointment of a conservator is founded primarily on the incapability of managing one's person or estate and not on the cause of that incapability.

(*Loss v. Loss*, 25 Ill. 2d 515; *MacDonald v. La Salle National Bank*, 11 Ill. 2d 122.) Thus, in the case before us, it is not the imperfection of mentality *per se* which would justify the appointment of a conservator, but rather the inability to manage one's estate due to such imperfection of mentality."

In the earlier case of *Bishop v. Welch* (1909), 149 Ill. App. 491, 498, the court observed the following:

"There is a clear distinction between a proceeding instituted to adjudge a person a lunatic or insane and a proceeding instituted to adjudge a person a spendthrift. The former relates to an inquiry and determination as to the condition of mind of the patient without special reference to his property, while the latter relates to an inquiry and determination as to certain habits of the person involved regarding his disposition to spend, waste or lessen his estate."

In the case before us, Langford told the examining doctors and the court he wishes to liquidate his entire estate, valued at between $200,000 and $400,000, and give it all to the "Christ is the Answer" organization. During the year preceding the hearing, he had given this organization approximately $50,000 plus an automobile. Langford has had no employment for over eight years prior to the hearing, relying entirely on the income from his property for his support.

Although brilliant and well educated, Langford expressed no desire or plan whatsoever to support himself except "through his ministry." The record is void of any evidence concerning Langford's income—past, present or potential—in his ministry with the religious group.

All of the medical testimony was to the effect that Langford had, and in most opinions still has, a form of schizophrenia. Among the several disabilities resulting from this disorder is the lack of rational judgment and the inability to learn from past experiences and to appreciate the consequences of the person's act. The opinions varied from incapability to manage his estate to a need for further psychiatric and emotional guidance, and counseling as to the disposition of his estate.

■■ It is the finding of this court that the manifest weight of the evidence reveals that Langford is incapable of managing his estate against waste and that a conservator should have been appointed.

For the above reasons, the order of the trial court denying the petition for appointment of a conservator of the person and estate of James Langford is reversed and the cause remanded for further proceedings.


Reversed and remanded with directions.


GREEN, P. J., and REARDON, J., concur.