# Illinois Official Reports

## Appellate Court

---

### *In re Rocker*, 2017 IL App (4th) 170133

---

| | |
|---|---|
| Appellate Court Caption | *In re* LEON C. ROCKER, an Alleged Disabled Adult (Leon C. Rocker, Petitioner-Appellant, v. First Financial Bank, as Guardian of the Estate of Leon C. Rocker, Respondent-Appellee). |
| District & No. | Fourth District<br>Docket No. 4-17-0133 |
| Filed | December 19, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Champaign County, No. 11-P-34; the Hon. Brian L. McPheters, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Scott M. Dempsey, of Dodson, Piraino & Associates, of Champaign, for appellant.<br><br>Kenneth D. Reifsteck, of Thomas, Mamer & Haughey, LLP, of Champaign, for appellee. |
| Panel | JUSTICE KNECHT delivered the judgment of the court, with opinion.<br>Presiding Justice Turner and Justice DeArmond concurred in the judgment and opinion. |

**OPINION**

¶ 1      Respondent, Leon C. Rocker, appeals the trial court's denial of his petition to terminate the guardianship of his estate. On appeal, Rocker argues (1) the trial court's order denying the petition to terminate guardianship was against the manifest weight of the evidence and (2) the trial court abused its discretion by admitting hearsay. We affirm.

## I. BACKGROUND

¶ 3      In April 2011, a plenary guardian was appointed for guardianship of the person and estate of petitioner, Leon C. Rocker. This guardianship was established because Rocker's family members discovered Rocker was suffering from mental conditions and sent more than $100,000 to individuals soliciting money over the Internet. In August 2013, the guardianship of Rocker's person was terminated in an agreed stipulation by Rocker and his guardian. In February 2015, respondent, First Financial Bank, was appointed successor guardian of Rocker's estate.

### A. Petition To Terminate the Guardianship

¶ 5      In July 2016, Rocker filed a "Petition to Discharge Guardian and Terminate Guardianship." Rocker alleged he was no longer a disabled adult and no longer required a guardian. Rocker further alleged he "has the capacity to perform the tasks necessary for the management of his own person and estate." To his petition, Rocker attached a physician's report, in which two medical professionals, Dr. Timothy G. Roberts and Dr. James M. Whisenand, indicated Rocker no longer suffered from a disability preventing him from managing his estate.

### B. First Hearing on Petition To Terminate the Guardianship

¶ 7      In November 2016, the trial court held a hearing on Rocker's petition to terminate the guardianship. At the hearing, the court heard testimony from Dr. Roberts, Dr. Whisenand, Rocker, and Lauren Kuntz.

¶ 8      Dr. Roberts testified as follows. In May 2016, he completed a physician's report, in which he indicated Rocker is capable of managing his own estate. Dr. Roberts has been involved in Rocker's guardianship proceedings since their initiation in 2011. Dr. Roberts initially advocated for the guardianship of Rocker's person and estate because Rocker's mental condition (bipolar disorder) caused him to be unable to manage his person or estate. However, in the past two or three years, Rocker's condition has improved, and Dr. Roberts no longer believes a guardianship is appropriate, despite the fact Rocker makes poor financial decisions. Dr. Roberts testified he is aware Rocker sends money to Internet solicitors, many of whom appear to be involved in scams. However, Dr. Roberts opined Rocker's decision to send money to others is no longer the product of a mental illness; rather, Dr. Roberts believes Rocker is decisional and is making this decision of his own volition. Dr. Roberts admitted Rocker's mental condition is of the type which could make him susceptible to financial manipulation; nonetheless, in his professional medical opinion, Dr. Roberts believes Rocker is capable of performing the tasks necessary to manage his own finances.

¶ 9        Dr. Whisenand, who provided a second opinion agreeing with Dr. Roberts's medical assessment, testified as follows. Rocker's bipolar disorder is a condition he will have throughout his lifetime, but bipolar disorder may be effectively managed and go into remission. In Dr. Whisenand's opinion, bipolar disorder does not necessarily make one more susceptible to manipulation, but he conceded that when an individual with bipolar disorder is symptomatic, the individual could be more susceptible to financial manipulation than if he or she was not symptomatic. When he spoke with Rocker, they did not discuss the specifics of his money transfers, but Dr. Whisenand was vaguely familiar with Rocker's practice of sending money to Internet solicitors. Dr. Whisenand indicated he was not concerned with the reasons why Rocker sent money to Internet solicitors; rather, he was concerned with whether Rocker was capable of making decisions free from the effects of bipolar disorder. Based upon his examination of Rocker, he believed Rocker was capable of making decisions free from the effects of bipolar disorder, even if those decisions were poor financial decisions. Dr. Whisenand did admit he believed sending money to Internet solicitors was not in Rocker's best interest.

¶ 10       Rocker testified as follows. He is a self-employed gardener and has between 35 and 50 clients. The money he makes from his gardening business is not managed by his guardian, First Financial Bank. He keeps the money, which is generally paid to him in cash or by check. He owns two rental units, which are managed by First Financial Bank through the guardianship, but he believes he can manage the rental units better than First Financial Bank. He receives a weekly stipend of $400 from First Financial Bank to be used for his essentials. He budgets his stipend to cover his essentials without needing to request more money from First Financial Bank. Rocker believes the guardianship should be terminated because he is capable of managing his estate.

¶ 11       Rocker testified he sends money to people in need for religious purposes, and he has continued to send money to others throughout the duration of the guardianship to several people. He uses the Internet, such as the website for "Lutheran World Relief," to locate people in need, and he likes to send money directly to these people—rather than giving a lump sum to the organization—because he likes to talk to them and hear their stories. He communicates with these individuals over the phone or the Internet, and most state they are suffering from illness or extreme poverty. When he began sending money to these individuals, he would wire transfer the funds. Following the death of his partner, John Short, he began using Short's identity to wire money to individuals because several institutions had "cut him off" and would no longer allow him to send wire transfers. Now, he purchases money orders with cash and sends the money orders via Priority Mail. He indicated he wished he had sent money this way all along because "[i]t's untraceable, and there would be no invasion of my privacy with that matter."

¶ 12       On at least one occasion, Rocker had sent money not for an altruistic purpose but, rather, because he expected something in return. Rocker's late partner passed away in 2005. In 2014, Rocker was contacted by Prince Unomah Ezekor, who informed Rocker that he had just learned of Short's death and Short had left approximately $680,000 for Rocker. This sum of money was being held in South Africa by the Bank of England, but Prince Unomah Ezekor needed Rocker to send money to cover taxes, "a gold seal," and other expenses before the $680,000 could be released to him. According to Rocker, the money was in transit at some point, but is currently being held in Turkey because the Turkish government requires payment

of taxes. Rocker hired a South African attorney, through his contacts with the Bank of England, to represent his interests with respect to Short's estate. He has since sent approximately $800 to $1000 to individuals in connection with this scheme. Rocker believes this story because the Bank of England knew Short's Social Security number and his birth date and other information.

¶ 13      Rocker was previously the victim of a scam, created by Patricia Diane Clark, in which he lost $106,750. Clark is currently serving a federal prison sentence in connection with this scam, and she has been ordered to pay restitution to the victims of her scam. The loss of this sum of money was the event which led Rocker's family to petition the trial court for a guardianship.

¶ 14      Kuntz, a trust officer for First Financial Bank, testified as follows. She is the trust officer handling Rocker's guardianship, and the monthly fee for First Financial Bank's trust services is 1.1% of the estate, which equates to approximately $500 per month in this case. His current income is derived from Social Security, an annuity, and rental income of approximately $2900 per month. When she speaks with Rocker, they discuss wire transfers and Rocker's estate, which is currently valued at approximately $420,000. When Kuntz became aware of Rocker's wire transfers, she contacted local businesses to investigate these transfers. Between January and October 2016, Rocker had wired more than $9600 dollars to individuals in several countries, including Jamaica and South Africa. Kuntz was unaware Rocker had begun sending money orders instead of money wires, but Rocker has indicated to Kuntz he plans to continue sending money to individuals in need. Kuntz does not believe Rocker is capable of managing his finances and therefore believes the guardianship of his estate is still necessary. Kuntz stated she was not concerned about the reason why Rocker sent money to others; rather, she was concerned with the amount of money he sends and "whether or not he would have the resources to continue to take care of himself."

¶ 15      Following this testimony, the trial court concluded the hearing and continued the matter to January 19, 2017.

¶ 16                                C. Memoranda Filed by the Parties

¶ 17      Prior to the second hearing in January 2017, Rocker and First Financial Bank filed memoranda of law with respect to the petition to terminate the guardianship of Rocker's estate. Rocker argued the issue at bar was "not whether [he] is making good decisions" but whether he makes his decisions because of mental disability or deterioration. According to Rocker, he was no longer unable to manage his estate *because of* mental disability or deterioration, rendering the guardianship unnecessary and inappropriate.

¶ 18      First Financial Bank noted the termination of a guardianship is a uniquely factual question and is a question left to the sound discretion of the trial court. It indicated the issue before the court was whether termination of the guardianship was in the best interests of the ward and is only appropriate where the ward has shown clear and convincing evidence of the ward's capacity to manage his or her person or estate. First Financial Bank argued there is not clear and convincing evidence showing Rocker is capable of managing his finances, and the trial court should therefore deny Rocker's petition to terminate the guardianship.

¶ 19      Rocker's guardian *ad litem* (GAL) also filed a written recommendation prior to the January hearing, wherein the GAL opposed termination of the guardianship. The GAL opined "[i]f left to his own devices, Mr. Rocker will immediately return to the [I]nternet and send whatever

money is requested of him from people sitting at Internet cafes in Nigeria and Jamaica on the belief that this will eventually make him rich." The GAL went on to explain several transactions Rocker has entered into with individuals over the Internet in which he sends them money and noted Rocker has no intention of ceasing this practice. The GAL stated:

> "I believe that the guardianship of Leon Rocker's estate should be maintained and that his Petition to Discharge Guardian and Terminate Guardianship should be denied. I make that recommendation without reservation. *** Mr. Rocker has demonstrated a well-established pattern of sending away his money to Internet solicitors. He has never meaningfully expressed any recognition that that is problematic behavior. And the corollary to that is that there is absolutely no reason to believe that Mr. Rocker has any intention of altering his financial behavior should he be given unfettered access to his money."

¶ 20            D. Second Hearing on Petition To Terminate the Guardianship

¶ 21            1. *Testimony*

¶ 22      On January 19, 2017, the trial court held a second hearing on Rocker's petition to terminate the guardianship. Kuntz was recalled to testify, and she testified as follows. On November 30, 2016, Kuntz accompanied Rocker to a Verizon store because Rocker needed a new cellular phone. The appointment took longer than expected, and Rocker needed to leave so he could get to a gardening job. Kuntz stated she would finish the appointment and bring Rocker's new phone to him afterward. While Kuntz was waiting at the Verizon store, Rocker received several phone calls, and she wrote down the numbers. She later called one of the numbers from her cellular phone and asked for "Evan," a name she made up. The man who answered her call indicated Evan was not there but she could call back in 30 minutes. Over the course of the next hour, she received three to four phone calls.

¶ 23      She answered one of these phone calls, and the caller identified himself as David Richard Williams. The man sounded like the same man who answered her original phone call. Rocker's counsel objected at this point on hearsay grounds, and the trial court overruled the objection. Williams indicated he was the CEO of American Cash Award Company, an association with Winners International. He gave Kuntz his cellular phone number as well as his office phone number. Williams "had a special Christmas promotion," and if Kuntz wanted to win the promotion, she needed to send him $150 by MoneyGram. If she did so, she would receive $2000 from Western Union. Kuntz asked him to send her an e-mail with the details and terms of the promotion. She then told Williams she believed the information was illegitimate, and she would not send him the money. Williams then stated Kuntz was eligible to win $2.5 million, so long as she sent the $150 MoneyGram. Rocker's counsel made a continuing objection to this testimony on hearsay grounds, which the trial court overruled.

¶ 24      Following the phone conversation, Kuntz received four e-mails apparently sent by Amanda Simpson on behalf of James Walker. These e-mails were later admitted into evidence over a hearsay objection by Rocker's counsel. Three of the e-mails stated:

> "Good Evening my name is james walker am the manager for (American cash awards company) this is a notification to notify you about a package that you have won on the date of (November 21, 2016). The reason why you have won is because of a coupon that you have fill out by you.now we place the coupon in a (DRAWING) where it came out as the first place winner of a (CASHIERS CHECK) for 2.5 million dallors. The

check is up under (Bank of America) you package number is (901Winner <u>U.SA</u>) the requirements that you are going to need to have so that you can received this package number 1 (YOU ARE GOING TO NEED THE REQUIREMENTS OF A MoneyGram recite) number 2 (YOU ARE GOING TO NEED THE REQUIREMENTS OF A valid ID) so you can received this Delivery so on the behalf of the American cash award We just want to tell you CONGRATULATIONS!!!! During this soon to be holiday we just want to tell our customer to stay safe. For any Questions Please contact the company at (8764660494 or 7607480212 or 9012314351) Thank you for your SERVICE!!!!!"

The fourth e-mail was worded differently but was similar in substance. Following her conversation with Williams, Kuntz received several phone calls per day (up to 25) through the month of December. Kuntz was asked whether she believed these people were soliciting money for charitable purposes, and she indicated she did not believe so.

¶ 25 Kuntz also reviewed Rocker's Verizon statement, which notated several international phone calls. She searched the phone numbers listed on the statement by using a website called "Spy-Dialer," a site that allows one to input a phone number and the site will generate a report, which will show the owner of the number and the location to which the number is associated. Kuntz prepared a document, which listed the numbers, the location to which the phone number is associated, and relevant notes (*i.e.*, whether the number was disconnected). This document was entered into evidence over Rocker's counsel's hearsay objection.

¶ 26 As part of her investigation, Kuntz looked up the website for "Lutheran World Relief," one of the organizations through which Rocker claims to make charitable donations to individuals in need. From what Kuntz could discern, the website does not allow its donors to connect with donees or provide the personal information of donees to donors. Rather, the site allows for donations "to specific emergencies, specific locations," or to purchase farm animals.

¶ 27 Kuntz reiterated her concern about Rocker's ability to manage his estate and indicated her belief he remains financially vulnerable. Kuntz expressed concern about Rocker's ability to say no to the people who contact him soliciting money. Kuntz also clarified the fact that she, acting as guardian, pays Rocker's monthly bills (*i.e.*, bills for his cell phone, loan payments, cable television, *et cetera*); the $400 weekly stipend is merely Rocker's spending money, which he uses to purchase gas and groceries among other things.

¶ 28                      2. *Argument and the Trial Court's Ruling*

¶ 29 During argument, Rocker's counsel reiterated his claim that Rocker was no longer making decisions because of a disability, therefore negating the propriety of a guardianship. Counsel argued the fact Rocker may make poor financial decisions is of no consequence because a guardianship is only appropriate where the ward is disabled and making decisions because of the disability.

¶ 30 First Financial Bank's counsel likened Rocker's practice of sending money to Internet solicitors to gambling, which is a form of disability under section 11a-2 of the Probate Act of 1975 (Probate Act) (755 ILCS 5/11a-2(c) (West 2016)). Counsel reiterated the standard for terminating a guardianship under section 11a-20 of the Probate Act and argued that the standard had not been met because Rocker had not shown clear and convincing evidence demonstrating (1) his ability to effectively manage his estate or (2) the fact he believed he was sending money for charitable purposes as opposed to "winning scams." Instead, counsel argued that First Financial Bank had shown clear and convincing evidence that Rocker remains

susceptible to financial manipulation and is unable to manage his estate so as to prevent its waste to Internet scams.

¶ 31    The GAL asserted that the guardianship should remain in place because Rocker is unable to say no to the Internet solicitors. The GAL believes these scammers will continue to solicit Rocker, who will continue to give them his money. The GAL also indicated Rocker was attempting to manipulate the trial court and the guardian into believing he is capable of managing his estate because he does not wish to be forthright about where his money is going. The GAL further argued Rocker is unable to separate fantasy from reality with respect to these Internet solicitations, which is evidenced by the fact Rocker believes the scheme about his late partner's alleged estate in South Africa.

¶ 32    The trial court—after considering the evidence, arguments, and the parties' written arguments and recommendations—denied Rocker's petition to terminate the guardianship. The court indicated this is not a case where the ward merely uses his money in eccentric or bizarre ways. Rather, this is a case where Rocker is not logical or rational with respect to the use of his funds and he is incapable of resisting the Internet and phone solicitations. The court indicated there is no basis for Rocker's belief his funds are being used for charitable purposes or for any benefit to him, as he claimed. The court also stated, "[T]his is not like he's making a bad investment[.] *** This is investing in things that there is no measurable percentage of a favorable outcome to him." The court thus concluded Rocker was still in need of a guardianship of his estate so as to prevent it from suffering and waste.

¶ 33    This appeal followed.

¶ 34                                II. ANALYSIS

¶ 35    Rocker argues on appeal (1) the trial court's order denying the petition to terminate guardianship of his estate was against the manifest weight of the evidence and (2) the trial court abused its discretion by admitting hearsay. Because resolution of Rocker's first argument relies on the resolution of his second argument, we will address the hearsay argument first.

¶ 36                                 A. Hearsay

¶ 37    Rocker argues the trial court's determination of whether a statement is hearsay is subject to *de novo* review, citing *Halleck v. Coastal Building Maintenance Co.*, 269 Ill. App. 3d 887, 891, 647 N.E.2d 618, 623 (1995), while the decision to admit the statement is subject to an abuse-of-discretion standard of review. We disagree.

¶ 38    The supreme court in *People v. Caffey*, 205 Ill. 2d 52, 89-90, 792 N.E.2d 1163, 1188 (2001), rejected the very argument Rocker now asserts. It recognized that reviewing courts sometimes review evidentiary rulings *de novo*, but it noted "[t]his exception to the general rule of deference applies in cases where 'a trial court's exercise of discretion has been frustrated by an erroneous rule of law.' " *Id.* at 89, 792 N.E.2d at 1188 (quoting *People v. Williams*, 188 Ill. 2d 365, 369, 721 N.E.2d 539, 542 (1999)). The supreme court concluded the decision to admit alleged hearsay testimony requires the trial court to exercise its discretion based upon the specific circumstances of the case before it because such rulings are not made in isolation. *Id.* at 89-90, 792 N.E.2d at 1188.

¶ 39    We thus review a trial court's decision to admit hearsay evidence for an abuse of discretion. *People v. Lerma*, 2016 IL 118496, ¶ 23, 47 N.E.3d 985; see also *Caffey*, 205 Ill. 2d

at 89-90, 792 N.E.2d at 1188. "An abuse of discretion occurs only where the trial court's decision is 'arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it.' " *Lerma*, 2016 IL 118496, ¶ 23, 47 N.E.3d 985 (quoting *People v. Rivera*, 2013 IL 112467, ¶ 37, 986 N.E.2d 634).

¶ 40    Rocker asserts the trial court abused its discretion by allowing Kuntz to testify about the basis for her opinion that Rocker remained susceptible to scammers, specifically about (1) the conversation she had with Williams, (2) the four e-mails she received, and (3) the document prepared by Kuntz, outlining the locations from which certain phone calls to her cellular phone had originated (exhibit No. 8). Rocker argues each of these bases constitutes inadmissible hearsay.

¶ 41    Hearsay is an out-of-court statement offered to prove the *truth of the matter asserted* and is generally inadmissible. Ill. R. Evid. 801(c) (eff. Oct. 15, 2015); R. 802 (eff. Jan. 1, 2011). The purpose for admitting the e-mails and testimony was to show why Kuntz believed Rocker remains susceptible to scams. The conversation with Williams and the e-mails were offered not to prove the truth of the statements contained therein; rather, they were offered to show the statements were incredible, thereby supporting her opinion of Rocker's continued susceptibility. The trial court did not abuse its discretion by admitting the e-mails or allowing Kuntz to testify about her conversation with Williams because this evidence, by definition, was not hearsay.

¶ 42    With respect to the exhibit No. 8, Rocker conflates the source of the information contained in the document with Kuntz's recordation of the information. The sources of the information contained in the document were the caller-identification feature of Kuntz's cellular phone and the computer-generated output of the Spy-Dialer website. Caller-identification information is not hearsay. *Caffey*, 205 Ill. 2d at 95, 792 N.E.2d at 1191 ("The information displayed on a caller ID device is not hearsay because there is no out-of-court asserter."). Similarly, the computer-generated output from Spy-Dialer was not hearsay; there was likewise no human making an out-of-court assertion. See *People v. Holowko*, 109 Ill. 2d 187, 191-92, 486 N.E.2d 877, 879 (1985) (concluding computer-generated records of telephone traces are not hearsay because the "evidence is generated instantaneously *** without the assistance, observations, or reports from or by a human declarant"). Any issue with the computer-generated output from Spy-Dialer would go to the weight of the evidence, not its admissibility. Thus, the sources of the information contained in the document, by definition, are not hearsay.

¶ 43    However, a hearsay question is created by the fact Kuntz physically recorded the information into a document, as the recordation is an out-of-court statement written by a declarant. See Ill. R. Evid. 801(a)-(c) (eff. Oct. 15, 2015). First Financial Bank argues the trial court did not abuse its discretion by admitting the document because it was not offered for the truth of the matter asserted—which would be to prove (1) the phone numbers she recorded actually called Kuntz, (2) whether or not those phone numbers were still in service (or whether her other notes were true), or (3) the location from which the phone calls originated. First Financial Back argues the document was offered "to show Rocker was being contacted by individuals willing to try to scam money from others," which we note is a proposition other than what the document purports.

¶ 44    Rocker fails to clearly explain how exhibit No. 8 was offered for the truth of the matter asserted, and he fails to cite authority supporting his claim. The entirety of Rocker's argument as it relates to this document is as follows:

"However, the locations where the telephone calls listed on Respondent's Exhibit 8 originated is inadmissible hearsay. Through Respondent's Exhibit 8, Kuntz is reporting information that was previously reported to her on Spy-Dialer to prove that Leon was receiving telephone calls from the locations that are listed on Exhibit 8. Respondent's Exhibit 8 is clearly hearsay and counsel for the Guardian did not assert to the trial court that this exhibit came within the general rule that hearsay evidence is inadmissible. The rationale given by the trial court for admission os [*sic*] Respondent's Exhibit 8 was that it would be very expensive and difficult to try to prove where the phone calls listed on that exhibit originated."

Rocker then discusses the rules relating to whether reversal is warranted upon concluding the trial court erroneously admitted inadmissible hearsay.

¶ 45 As we previously stated, Rocker conflates the computer-generated information with Kuntz's recordation of it. The computer-generated information is not hearsay, and Rocker has not persuaded this court that the recordation of this information was hearsay. Both First Financial Bank and Rocker appear to agree the document was offered to prove *Rocker* was being contacted by scammers whose phone calls originated from the locations noted on the document. The document purports *Kuntz*—not Rocker—received phone calls from those locations. Even Rocker's argument alleges the document was offered to prove something other than what it purports. We conclude the trial court did not abuse its discretion by admitting the document such that its decision was "arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it." (Internal quotation marks omitted.) *Lerma*, 2016 IL 118496, ¶ 23, 47 N.E.3d 985.

¶ 46                              B. Termination of Guardianship

¶ 47 Next, Rocker argues the trial court's decision to deny his petition to discharge and terminate guardianship was against the manifest weight of the evidence. We disagree.

¶ 48 First Financial Bank contends Rocker confuses the standard for creating a guardianship, which is governed by section 11a-3 of the Probate Act (755 ILCS 5/11a-3 (West 2016)), with the standard for terminating a guardianship, which is governed by section 11a-20 (755 ILCS 5/11a-20 (West 2016)). Because the guardian, First Financial Bank, does not believe Rocker's interests would be best served by terminating the guardianship, this case is governed by section 11a-20(a) (755 ILCS 5/11a-20(a) (West 2016)). *Cf.* 755 ILCS 5/11a-20(b-5) (West 2016) (setting forth the standard for termination of guardianship where the guardian agrees the guardianship should be terminated). Pursuant to section 11a-20(a),

"[U]pon the filing of a petition by or on behalf of a person with a disability or on its own motion, the court may terminate the adjudication of disability of the ward, revoke the letters of guardianship of the estate or person, or both, or modify the duties of the guardian if the ward's capacity to perform the tasks necessary for the care of his person or the management of his estate has been demonstrated by clear and convincing evidence. A report or testimony by a licensed physician is not a prerequisite for termination, revocation or modification of a guardianship order under this subsection (a)." 755 ILCS 5/11a-20(a) (West 2016).

"The sole issue facing the trial court in a restoration proceeding is the mental condition and the best interests of the ward." *In re Estate of Wellman*, 174 Ill. 2d 335, 348, 673 N.E.2d 272, 278 (1996). The propriety of a guardianship is a "uniquely factual question for the trial court,

whose findings will not be disturbed on review unless they are against the manifest weight of the evidence." *Id.* at 349, 673 N.E.2d at 278. "A court's *** finding is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where its finding is unreasonable, arbitrary, or not based on the evidence presented." *In re Al. S.*, 2017 IL App (4th) 160737, ¶ 41, 73 N.E.3d 1178.

¶ 49   Much of Rocker's argument focuses on the fact he has been found decisional and he is no longer making decisions "because of" a disability. However, those arguments are not alone determinative. We are also concerned with his best interests and whether he presented clear and convincing evidence he has full capacity to manage his estate in such a way as to prevent its waste. See 755 ILCS 5/11a-20(a) (West 2016); *In re Estate of Langford*, 50 Ill. App. 3d 623, 627, 364 N.E.2d 735, 738 (1977) (concluding the test in cases involving a guardianship over an estate "is incapability to manage one's own affairs so that waste and suffering are inevitable"). As cases involving guardianships present unique factual questions, we do not find Rocker's factual comparisons to other cases particularly useful. See *In re C.M.*, 305 Ill. App. 3d 154, 163, 711 N.E.2d 809, 815 (1999) (concluding where a case is *sui generis*, courts do not typically make factual comparisons to other cases).

¶ 50   There was substantial evidence presented—including Rocker's own admission—showing Rocker intended to continue sending his money to Internet and phone solicitations, many of which appear to be scams. Indeed, Rocker has given away thousands of dollars even since the guardianship was established. Prior to the guardianship, Rocker had given away in excess of $100,000, and very likely much more. There was conflicting evidence presented on the question of whether these solicitations were of a charitable nature or were "winning scams." Rocker did present evidence showing physicians believe he is decisional, and he testified he was capable of ensuring his essentials (*i.e.*, food, gas, and clothing) were paid for each month. However, most of his monthly bills (*i.e.*, bills for cable, utilities, cellular phone, etc.) were paid by First Financial Bank. Rocker's testimony that he was able to budget his $400 weekly stipend, plus his gardening income, so as to ensure he did not want for essentials is not particularly demonstrative of his ability to effectively manage his larger estate and prevent its waste, in light of his admission and continued practice of sending sizeable amounts money to Internet solicitors, many of whom appear to be involved in scams.

¶ 51   It is clear Rocker has a permanent mental illness—he continues to have bipolar disorder. While stable now, he continues to receive treatment and medication. Both Dr. Roberts and Dr. Whisenand noted his mental condition could make him susceptible to financial manipulation, and Whisenand had only limited awareness of Rocker's financial choices. He is only seen by his psychiatrist every six months. Rocker's behavior and choices may be "decisional" but they go far beyond poor financial decisionmaking. The 2014 episode involving the African prince, South Africa, the Bank of England, and Turkey was not based in reality, and it occurred during a period when Rocker was stable. We conclude the petitioner has not established by clear and convincing evidence that he is no longer disabled or that he is fully able to make financial decisions free from the effects of his disorder and manage his estate so as to prevent waste.

¶ 52   Given the evidence presented and our standard of review, we cannot say the trial court's decision to deny Rocker's petition to terminate the guardianship was against the manifest weight of the evidence such that it was clearly evident the court should have decided Rocker was capable of managing his estate so as to prevent its waste. The evidence presented shows the only change was the "scale to which [Rocker] is sending money to these scammers," which

is directly correlated to the limited access he currently has to his funds due to the guardianship. We conclude it is not clearly evident from the record that Rocker is capable of managing his own estate such that his interests would be best served by terminating the guardianship; instead, the evidence tends to show his interests would be best served by continuing the guardianship to prevent further large-scale waste of his estate, especially in light of his own admission he intends to continue sending money to Internet solicitors.

¶ 53                                        III. CONCLUSION
¶ 54            We affirm the trial court's judgment.

¶ 55            Affirmed.